UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| MOORE, et al., | Case No:  C 09-1823  SBA |
| Plaintiffs, | |
| vs. | **ORDER REGARDING DEFENDANTS' MOTION TO DISMISS** |
| VERIZON COMMUNICATIONS INC., et al., | [Docket Nos. 43, 44-1] |
| Defendants. | |

The parties are presently before the Court on Defendants' Motion to Dismiss First Amended Complaint, pursuant to Federal Rule of Civil Procedure 12(b)(6).  (Docket Nos. 43, 44-1.)[1]  Having read and considered the papers filed in connection with this matter and being fully informed, the Court hereby GRANTS-IN-PART and DENIES-IN-PART the motion for the reasons set forth below.  The Court, in its discretion, finds this matter suitable for resolution without oral argument.  See Fed.R.Civ.P. 78(b).

I.      **BACKGROUND**

   A.      **PLAINTIFFS' ALLEGATIONS**

Plaintiffs bring this purported class action against several Verizon-related entities (collectively, "Verizon" or "Defendants").  Verizon provides local wireline telephone services to customers in several states, including California.  (First Amended Complaint ("FAC"), ¶ 11.)  Verizon provides these services through its operating telephone subsidiary companies, such as Defendant Verizon California (which are also known as local exchange carriers, or "LECs").  (Id., ¶¶ 5, 13.)  The Verizon LECs are also responsible for billing and collection. (Id., ¶ 32.)  The Verizon LECs bill and collect not only on their own behalf, but also on behalf

---

[1] On November 5, 2009, Defendants filed a "Notice of Errata" correcting certain typographical errors in their initial motion, filed on November 3, 2009 (as Docket No. 43).  Docket No. 44-1 is Defendants' "corrected motion."

of other third-party companies for third-party telecommunication products and services, such as long distance and voicemail services.  (Id., ¶¶ 33, 34.)  Over the years, the Verizon LECs have made their billing and collection systems available to providers of varied products and services.  (Id., ¶ 34.)  As a result, there has been a proliferation in the number of service providers "piggybacking" on the Verizon LECs' billing and collection systems.  (Id.)  Some of these third-party products and services do not directly relate to telephone services.  (Id., ¶ 35.)  For instance, such products and services include those of automobile roadside service clubs, diet companies, and credit repair companies.  (Id., ¶ 36.)  These products and services are typically subscription-based and renew automatically (on a monthly, quarterly, or annual basis) and the charges are included on Verizon's bills to its customers.  (Id.)  Verizon is compensated for its billing and collection services by retaining portions of the amounts billed and collected, typically based on a percentage of the billing revenue.  (Id., ¶ 38.)  Due to costs and other factors, only the largest third-party service providers are able to bill directly through Verizon. (Id., ¶ 39.)  Therefore, the vast bulk of third-party service providers turn to a handful of third-party billing aggregators.  (Id.)  Billing aggregators act as intermediaries between the service providers and the Verizon LECs.  (Id.)

Plaintiffs allege that Verizon's third-party billing and collection system lacks sufficient safeguards to prevent unauthorized charges from being added to customers' wireline telephone bills (a practice known as "cramming").  (Id., ¶¶ 50, 63.)  For instance, Plaintiffs allege that, unlike transactions made using checks and credit cards, which use signatures, highly private account numbers, and various other security measures, under the system used by Verizon, the only item of information a billing aggregator or service provider needs to charge a customer is a telephone number.  (Id., ¶ 46.)  Plaintiffs also allege that Verizon fails to take sufficient steps to ensure that such charges have been authorized; rather, Verizon purports to rely on its billing aggregators and/or third-party providers to obtain such authorizations.  (Id., ¶ 55.)

Plaintiffs assert that Verizon's billing of unauthorized charges is further exacerbated by the misleading and deceptive nature of the telephone bills it sends to customers.  (Id., ¶ 65.)  They contend that customers are led to believe the charges are legitimate by the very fact that

they are included on the bill.  (Id.)  In addition, Plaintiffs challenge the allegedly misleading and/or unclear billing descriptions Verizon provides in its bills, and assert that the billing descriptions do not provide sufficient detail to enable customers to inquire about, or contest, unauthorized charges.  (Id., ¶ 68.)

With respect to the named Plaintiffs Moore and Jones, each asserts that two unauthorized third-party charges appeared on their Verizon telephone bills over a two-month period in 2009.  (Id., ¶¶ 71, 72, 77, 78.)  They allege that Verizon "has failed to provide … a complete refund of such charges, with interest, costs and attorneys' fees …."  (Id., ¶¶ 74, 80.)

Plaintiffs Moore and Jones bring this action on behalf of themselves and the following classes:

> (a) The "Injunctive and Declaratory Class," which consists of "[a]ll Verizon local wireline customers in the United States with respect to whom Verizon billed charges for third-party products and services using its billing and collection system";
>
> (b) The "Liability Class," which consists of "[a]ll current and former Verizon local wireline customers (1) with respect to whom Verizon billed and collected charges for third-party products and services using its billing and collection system and for which Verizon did not possess a valid authorization from the customer, and (2) as to which the customer suffered loss"; and
>
> (c) The state-wide "Sub-Class," which consists of "[a]ll current and former Verizon local wireline customers within the State of California (1) with respect to whom Verizon billed and collected charges for third-party products and services using its billing and collection system and for which Verizon did not possess a valid authorization from the customer, and (2) as to which the customer suffered loss."  (Id., ¶¶ 81-82.)

Plaintiffs' causes of action are as follow: (1) Violations of the Racketeer Influenced Corrupt Organizations Act ("RICO"); (2) Conspiracy to Violate RICO; (3) Violations of 47 U.S.C. §§ 201, *et seq.*, and 47 C.F.R. § 64.2401; (4) Breach of Contract (on behalf of the Sub-Class against Verizon California); (5) Tortious Interference with a Contract (against all Defendants except the Verizon LECs); (6) Breach of Trust; (7) Violation of California Public Utilities Code § 2890 (on behalf of the Sub-Class against Verizon California); and (8) Violation of California Business and Professions Code § 17200, *et seq.* (on behalf of the Sub-Class).  Plaintiffs seek both damages and injunctive relief.

**B.     DEFENDANTS' MOTION TO DISMISS**

Defendants now move to dismiss the entirety of Plaintiffs' complaint under Rule 12(b)(6) on the following grounds:  (1) Plaintiffs' state law claims are barred by California Public Utilities Code § 1759 because they conflict with the California Public Utilities Commission's ("Commission") regulatory policies; or, alternatively, the state law claims fail as a matter of law for other specific reasons; (2) Plaintiffs' claim under 47 U.S.C. §§ 201, *et seq*. (and the implementing FCC regulation 47 C.F.R. § 64.2401) fails because these laws do not apply to third-party billing services; and (3) Plaintiffs' RICO claims fail because Plaintiffs have failed to allege an associated-in-fact enterprise, and Plaintiffs have failed to allege any predicate acts of racketeering activity.

Lastly, Defendants request that if the Court finds that any of Plaintiffs' claims survive this motion to dismiss, the Court refer those claims to the California Public Utilities Commission or the Federal Communications Commission ("FCC") under the doctrine of primary jurisdiction.[2]

**C.     DEFENDANTS' REQUEST FOR JUDICIAL NOTICE**

Along with their motion, Defendants have requested that the Court take judicial notice of the following documents: (1) Plaintiff Moore's January 2009 and February 2009 Verizon telephone bills; (2) Plaintiff Jones's April 2009 and May 2009 Verizon telephone bills; (3) certain published decisions and orders of the Commission; (4) a section of Verizon California's filed tariff; and (5) certain published orders, decisions, and policy statements of the FCC. (Docket Nos. 43-1, 43-4.)  Plaintiffs have not opposed Defendants' request or disputed the authenticity of these documents.  As indicated, Plaintiffs refer to these four telephone bills in their FAC.  (FAC, ¶¶ 71, 72, 77, 78.)  Moreover, the remaining documents are properly subject

---

[2] After the close of briefing, Defendants submitted two Requests for Leave to Submit Additional Authority in support of their motion to dismiss.  (Docket Nos. 53, 56.)  The first (Docket No. 53) attaches a February 12, 2010 ruling by the Commission, along with significant legal argument.  The second (Docket No. 56) attaches, without any legal argument, two judicial decisions issued after the close of briefing.  Civil Local Rule 7-3(d) provides that "counsel may bring to the Court's attention a relevant judicial opinion published after the date the opposition or reply was filed by serving and filing a Statement of Recent Decision … <u>without argument</u>."  (Emphasis added.)  Accordingly, while this Court GRANTS Defendants' requests, the improper legal arguments have not been considered.

to judicial notice because they are public documents whose existence is "capable of ready and accurate determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b); see also Western Radio Servs. Co. v. Qwest Corp., 530 F.3d 1186, 1192 n.4 (9th Cir. 2008) (taking judicial notice of a Commission order); Smith v. Spring Commc'ns Co., 1996 WL 1058204, 5 n.4 (N.D. Cal. 1996) (taking judicial notice of tariffs filed with the Commission and FCC).  Accordingly, Defendants' Request for Judicial Notice is GRANTED.[3]

Defendants have submitted the FCC and Commission documents to describe the regulatory efforts of these agencies with respect to cramming.  These regulatory efforts relate to Defendants' claim that Plaintiffs' state law claims are barred because they conflict with the Commission's regulatory policies.

As reflected in the judicially noticed documents, the Commission's regulatory efforts include the 1998 Anti-Cramming Best Practices Guidelines.  (Ring Decl., Ex. J at 1 (FCC's Anti-Cramming Best Practices Guidelines, July 22, 1998)).  Also in 1998, the California Legislature enacted Public Utilities Code Sections 2889.9 and 2890 "to deter cramming and clarify the related rights and remedies available to California consumers," and granted broad authority to the Commission to "adopt rules, regulations, and issue decisions and orders, as necessary, to safeguard the rights of consumers and enforce the provisions of [Sections 2889.9 and 2890]."  Cal. Pub. Util. Code § 2889.9(i).  The Commission has also issued decisions implementing Sections 2889.9 and 2890, referred to as the 2000 Cramming Rules, the Interim Non-Com Rules, and the 2006 Cramming Rules.[4]

---

[3] In deciding a Rule 12(b)(6) motion, the court "may generally consider only allegations contained in the pleadings, exhibits attached to the complaint, and matters properly subject to judicial notice[.]" Williston Basin Interstate Pipeline Co. v. An Exclusive Gas Storage Leasehold and Easement in the Cloverly Subterranean, Geological Formation, 524 F.3d 1090, 1096 (9th Cir. 2008).  Also, documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading, may be considered on a Rule 12(b)(6) motion.  Branch v. Tunnell, 14 F.3d 449, 454 (9th Cir. 1994) (overruled on other grounds in Galbraith v. County of Santa Clara, 307 F.3d 1119, 1127 (9th Cir. 2002)); accord Parrino v. FHP, Inc., 146 F.3d 699, 706 (9th Cir. 1998).

[4] See Ring Decl., Ex. E (Final Opinion On Rules Designed To Deter Slamming, Cramming, & Sliding, D.00-03-020 (Cal. P.U.C., Mar. 2, 2000) ("2000 Cramming Rules")); Ex. F (Interim Opinion Adopting Interim Rules Governing the Inclusion of NonCommunciations-Related Charges in Telephone Bills, D.01-07-030 (Cal. P.U.C., July 12, 2001) ("Interim Non-Com Rules")); Ex. G (Decision Issuing Revised Gen. Order 168, Market Rules To Empower Telecomms. Consumers & To Prevent Fraud, D.06-03-013 (Cal. P.U.C. Mar. 2, 2006) ("2006 Cramming Rules")).

## II.     DISCUSSION

### A.     LEGAL STANDARD

A Rule 12(b)(6) dismissal for failure to state a claim can be based on either: (1) the lack of a cognizable legal theory; or (2) insufficient facts to support a cognizable legal claim. Balistreri v. Pacifica Police Dep't, 901 F.2d 696, 699 (9th Cir. 1990).  The plaintiff's factual allegations "must be enough to raise a right to relief above the speculative level."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 556 (2007).  In considering a Rule 12(b)(6) motion, the court is to "accept all factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party."  Outdoor Media Group, Inc. v. City of Beaumont, 506 F.3d 895, 899-900 (9th Cir. 2007).  "If a complaint is dismissed for failure to state a claim, leave to amend should be granted unless the court determines that the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency." Schreiber Distributing Co. v. Serv-Well Furniture Co., Inc., 806 F.2d 1393, 1401 (9th Cir. 1986); see also Steckman v. Hart Brewing, Inc., 143 F.3d 1293, 1298 (9th Cir. 1998) ("Although there is a general rule that parties are allowed to amend their pleadings, it does not extend to cases in which any amendment would be an exercise in futility … or where the amended complaint would also be subject to dismissal ….") (internal citations omitted).

### B.     PLAINTIFFS' FEDERAL CLAIMS

#### 1.     RICO (First Cause of Action)

RICO provides for civil liability for "'[a]ny person injured in his business or property by reason of a violation of section 1962.'"  Beck v. Prupis, 529 U.S. 494, 495 (2000) (quoting 18 U.S.C. § 1964(c)).  Section 1962(c) "makes it 'unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.'"  Id. at 497. To state a civil RICO claim, a plaintiff must allege five elements: (1) conduct, (2) of an enterprise, (3) through a pattern, (4) of racketeering activity, establishing that (5) the defendant caused injury to the plaintiff's business or property.  See Sedima, S.P.R.L. v. Imrex Co., 473

U.S. 479, 496 (1985).  A RICO enterprise is defined "to include any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."  18 U.S.C. § 1961(4).  A RICO enterprise has further been described as "an entity, for present purposes a group of persons associated together for a common purpose of engaging in a course of conduct."  U.S. v. Turkette, 452 U.S. 576, 583 (1981).  The pattern of racketeering activity is, on the other hand, a series of criminal acts as defined by the statute.  Id.

In their motion, Defendants argue that Plaintiffs' RICO claim fails on two grounds: Plaintiffs have failed to allege an associated-in-fact enterprise; and Plaintiffs have failed to allege any predicate acts of racketeering activity.  Each of those arguments is addressed in turn.

### a)   *Plaintiffs Have Sufficiently Alleged an Associated-in-Fact Enterprise*

In their Complaint, Plaintiffs allege that the associated-in-fact enterprise consists of Defendants, the billing aggregators, and the third-party providers for which Defendants provided third-party billing services.  (FAC, ¶ 103.)  They further allege that the enterprise was engaged in the following scheme to defraud Defendants' customers: "[e]ach and every member of the Enterprise participated in the process of obtaining, transmitting, billing and collecting phony, unauthorized charges on Verizon's wireline bills to the members of the class."  (Id.)  With respect to the fraudulent scheme generally, Plaintiffs allege that Defendants knew that the accounts that they are buying from the aggregators, and then billing and collecting from their customers, include millions of dollars of unauthorized charges.  (Id., ¶¶ 2-4, 38, 43-58.)  Plaintiffs further allege that Defendants deliberately choose to continue to bill and collect for millions of dollars of charges that they know are unauthorized and not due, and falsely represent to their customers that the charges are authorized and due.  (Id., ¶¶ 2-3, 54-56, 61-63.)  Lastly, Plaintiffs allege that Defendants are "a full joint venturer with the third-party providers and the billing aggregators involved in this system, keeping for itself a substantial portion of the amounts billed and collected for these third-party services, running in the

1    millions annually."[5]  (Id., ¶ 4.)

2         Because Plaintiffs' RICO claim is based on fraud, they must establish that the enterprise

3    "share[ed] a common purpose to engage in a particular fraudulent course of conduct and

4    work[ed] together to achieve such purposes."  First Capital Asset Mgmt., Inc. v. Satinwood,

5    Inc., 385 F.3d 159, 174 (2nd Cir. 2004); Odom v. Microsoft Corp., 486 F.3d 541, 552 (9th Cir.

6    2007) (en banc).

7         Viewed in this context, Defendants argue that Plaintiffs' RICO claim fails because the

8    fraudulent scheme upon which it is based "amounts to no more than ordinary business conduct

9    and indeed conduct that conforms to the regulatory policies of the FCC and the CPUC."

10   (Defs.' Mtn. at 19.)  But as indicated below, Plaintiffs have stated a claim for violation of

11   Public Utilities Code Section 2890(a), which imposes a requirement upon public telephone

12   utilities, independent of the Commission's rules: "A telephone bill may only contain charges

13   for products or services, the purchase of which the subscriber has authorized."  Cal. Pub. Util.

14   Code § 2890(a).  Moreover, Plaintiffs have sufficiently stated a claim for violation of the

15   Unfair Business Practices Act (Cal. Bus. & Prof. Code §§ 17200, et seq.) based on, among

16   other things, Defendants' allegedly fraudulent billing practices.  Therefore, Defendants'

17   argument that the billing practices challenged by Plaintiffs cannot give rise to a claim of fraud

18   under RICO is not persuasive.

19        Additionally, Defendants' reliance on In re Jamster Marketing Litigation, 2009 WL

20   1456632 (S.D. Cal. 2009) for the proposition that Plaintiffs have not sufficiently stated a

21   "common purpose" of the enterprise is misplaced.  In that case, plaintiffs (mobile telephone

22   customers) sued their wireless providers and third-party content providers.  Plaintiffs alleged

23   that mobile content providers engaged in fraudulent advertising in representing that content

24   was "free," agreed with wireless providers to bill customers for content which they had not

25   authorized, and colluded with wireless providers to share revenues that were collected as part

26   of the enterprise.  Specifically, the plaintiffs alleged that defendants acted "with the intentional

27

28   _____
     [5] The predicate RICO criminal acts alleged in the Complaint are Defendants' violations of federal
     wire fraud, mail fraud, and bank fraud statutes (18 U.S.C. §§ 1343, 1341 and 1344).  (FAC, ¶¶ 93-99.)

1   and common purpose of increasing and facilitating the unauthorized and fraudulent sale of []

2   mobile content with the intended goal of increasing revenue" for defendants.  Id. at 5.

3        In view of those allegations, the district court dismissed the plaintiffs' RICO claim

4   because they failed to particularly establish that the common purpose of the enterprise was to

5   engage in a course of illegal conduct.  Id.  In so finding, the court held that "[a]t a minimum,

6   Plaintiffs must set forth particularized allegations that Wireless Providers and Content Provides

7   had the common purpose of increasing their revenues by fraudulent means."  Id.

8        While the general nature of this case is similar to that of Jamster, Plaintiffs' allegations

9   here are more particularized with respect to the enterprise's common purpose.  For example,

10  the instant Plaintiffs allege that the enterprise worked together to create, implement, and share

11  the profits of the fraudulent scheme, the success of which depended upon the active and

12  knowing participation of Defendants and the aggregators and service providers.  (See FAC ¶¶

13  1-4, 38-41, 50-58, 61-63.)  Plaintiffs further allege that Defendants could not have

14  implemented the fraudulent scheme without the service providers originating the fraudulent

15  charges; and the aggregators and service providers could not have implemented the fraudulent

16  scheme without Defendants' agreement to purchase, bill, and share the profits from the

17  unauthorized fraudulent charges and Defendants' refusal to insist upon antifraud provisions in

18  the contracts with the aggregators and service providers.  (Id.)

19       Moreover, Plaintiffs allege that the Defendants, the billing aggregators, and service

20  providers exploited Defendants' faulty billing practices, which allowed for the placement of

21  unauthorized charges on customers' bills:  "All the way up and down the line, Verizon, the

22  billing aggregators and the third-party providers know that the billing and collection system

23  used lacks sufficient checks and safeguards to prevent unauthorized charges from being added

24  to customers' wireline telephone bills – indeed, to the contrary, they all know that there is a

25  significant likelihood of unauthorized charges, given the system presently used – and they have

26  knowingly exploited those defective systems to implement and carry out their fraudulent

27  scheme."  (Id. at ¶ 6.)  In sum, Plaintiffs' particularized allegations regarding the enterprise's

28  deliberate exploitation of Defendants' faulty billing practices to further their common purpose

1    – to enable collection of millions of dollars in fraudulent charges – are sufficient at the

2    pleading stage to allege an associated-in-fact enterprise.

3          Given the present allegations, this case is more analogous to the Ninth Circuit decision

4    Odom v. Microsoft Corp., 486 F.3d 541 (9th Cir. 2007).  In Odom, the plaintiff alleged with

5    his RICO claim that Microsoft and Best Buy had the common purpose of increasing the

6    number of people using Microsoft's Internet Service by fraudulent means.  To show the

7    wrongful common purpose of the enterprise, plaintiff set forth the fraudulent means to carry

8    out the scheme.  In particular, plaintiff alleged that Best Buy furthered this common purpose by

9    distributing Microsoft Internet Trial CD's and conveying its customers' debit and credit card

10   information to Microsoft.  Id. at 552.  Microsoft then used the information to activate customer

11   accounts.  Id.  In denying the defendants' motion to dismiss the RICO claim, the Ninth Circuit

12   explained "[t]hese allegations are more than adequate to establish, if true, that Microsoft and

13   Best Buy had a common purpose of increasing the number of people using Microsoft's Internet

14   service through fraudulent means."  Id.  Here, Plaintiffs have similarly alleged the fraudulent

15   means that the enterprise used to carry out its scheme; i.e., the enterprise exploited Defendants'

16   defective billing and collecting system to place unauthorized charges on customers' accounts.

17          For these reasons, Plaintiffs have adequately alleged an associated-in-fact enterprise

18   under RICO.

19                    b)       **_Plaintiffs Have Sufficiently Alleged a Pattern of Racketeering_**

20                             **_Activity_**

21          Alternatively, Defendants argue that Plaintiffs have not sufficiently alleged a pattern of

22   racketeering activity because they have failed to set forth their fraud allegations with

23   particularity as required by Federal Rule of Civil Procedure 9(b).

24          Rule 9(b) requires that Plaintiffs plead with detail "the time, place, and manner of each

25   act of fraud, plus the role of each defendant in each scheme."  Lancaster Com. Hosp. v.

26   Antelope Valley Hosp. Dist., 940 F.2d 397, 405 (9th Cir. 1991).  Courts have also phrased the

27   heightened pleading standard as requiring "the who, what, when, where, and how of the

28   misconduct charged."  Vess v. Ciba-Geigy Corp., 317 F.3d 1097, 1106 (9th Cir. 2003).  The

pleading requirements of Rule 9(b) are satisfied if the compliant "identifies the circumstances constituting fraud so that a defendant can prepare an adequate answer from the allegations." Moore v. Kayport Packaging Exp., Inc., 885 F.2d 531, 540 (9th Cir. 1989).

In this case, Plaintiffs have satisfied Rule 9(b) because they have alleged the "who, what, when, where, and how" of Defendants' fraudulent billing scheme as exploited by the RICO enterprise, both with respect to the named Plaintiffs and the class. Plaintiffs have alleged that the misrepresentations occur on Defendants' bills to its customers, at the time the bills are transmitted to the customers. (FAC, ¶¶ 65-68, 70-80.) The nature of the misrepresentation is that the bills indicate the customers consented to and approved the charges when, in fact, the customers did not so consent. (Id., ¶¶ 65-66.) Also, Plaintiffs allege a specific fraudulent billing practice of Defendants: their failure to authenticate billing entries on customers' bills. (Id., ¶ 2.) Furthermore, Plaintiffs allege how the billing scheme operates, how it is fraudulent, how it affects Defendants' customers, and that Defendants are aware of the issues but have made no effort to correct their system. (Id., ¶¶ 1-5.) In sum, Plaintiffs' allegations provide adequate notice to Defendants to allow them to defend against these allegations, and therefore Defendants' challenge fails. See e.g. Ranger v. T-Mobile USA, Inc., 2009 WL 416003, 2-3 (C.D. Cal. 2009) (in a "cramming" case, cell phone customer met the heightened pleading requirements for fraud claims by providing specific factual allegations about the cell phone company's fraudulent billing practices).

### 2.   Conspiracy to Violate RICO (Second Cause of Action)

Defendants argue that because Plaintiffs fail to state a claim under Section 1962(c) of the RICO Act, Plaintiffs' RICO conspiracy claim also fails as a matter of law. See Howard v. America Online Inc., 208 F.3d 741, 751 (9th Cir. 2000) ("Plaintiffs cannot claim that a conspiracy to violate RICO existed if they do not adequately plead a substantive violation of RICO."). As indicated, Plaintiffs have adequately plead a substantive RICO violation, and therefore Defendants' challenge to the RICO conspiracy claim fails.

### 3.   Violations of 47 U.S.C. §§ 201, *et seq.*, and 47 C.F.R. § 64.2401 (Third Cause of Action)

Plaintiffs' Third Cause of Action relies upon Title II of the Federal Communications Act, specifically 47 U.S.C. §§ 201(b), 206, and 207, and implementing FCC regulation 47 C.F.R. § 64.2401 (Truth-in-Billing Requirements).  Title II outlines the duties of common carriers in the provision of interstate communication services and establishes procedures for enforcement of those duties.  47 U.S.C. §§ 201-224.  Section 201(b) of the Act prohibits "unjust" and "unreasonable" practices "in connection with such communication service."  Defendants argue that Plaintiffs' claim under Title II fails because third-party billing and collection services provided by LECs are not considered a "communication service" within Title II of the Act.

In 1986, the FCC concluded that "billing and collection services provided by local exchange carriers are not subject to regulation under Title II of the Act."  In re Detariffing of Billing & Collection Servs., 102 F.C.C.2d 1150, at p. 11 (1986) ("Detariffing Order").  In view of the Detariffing Order, courts have dismissed claims alleging violations of Section 201 based on third-party billing services.  For instance, in Brittan Commc'ns Int'l Corp. v. Sw. Bell Tel. Co., 313 F.3d 899 (5th Cir. 2002), a long-distance telephone services provider (Brittan) billed its customers via a local exchange carrier (LEC) (Southwestern) through a third-party billing aggregator (Billing Concepts) which submitted Brittan's charges along with those of other long-distance providers to Southwestern for placement on the bills of its local telephone service customers.  Id. at 902.  Southwestern, the LEC, would collect the payments due, and forward the monies received to Billing Concepts, which would then transfer funds to Brittan.  Id. Southwestern notified Billing Concepts that it would no longer accept billing records from Brittan in response to "cramming" complaints by Southwestern's customers.  Id.  Brittan sued Southwestern, seeking damages stemming from the suspension of its billing and collection services, alleging violation of Title II of the Communications Act.  On appeal from a decision in favor of Southwestern, the Fifth Circuit held that the LEC Southwestern's billing and collection services did not fall within the scope of Title II of the Communications Act.  Id. at 905-906.

In so finding, the Brittan court quoted from the FCC's Detarrifing Order in stating that

'"carrier billing or collection for the offering of another unaffiliated carrier is not a communication service for purposes of Title II of the Communications Act.'" Id. at 905.  The court further found that "billing and collection [are] 'financial and administrative service[s]' ... [and] 'billing and collection services provided by local exchange carriers are not subject to regulation under Title II of the Act.'" Id. (citing In the Matter of Federal-State Joint Bd. on Universal Service, 13 F.C.C. Rcd. 24, 744, ¶ 70 & n. 87 (1998) (finding that billing and collection services are subject to Title II, but only as to a carrier's own billing and collections); see also Chladek v. Verizon N.Y. Inc., 96 Fed. Appx. 19, 22 (2nd Cir. 2004) (finding that billing and collection services provided by a telecommunications carrier to a pay-per-call information and entertainment service were not subject to Title II).

Likewise, Plaintiffs' reliance on the Truth-In-Billing Requirements ("Requirements") of 47 C.F.R. § 64.2401 fails because these regulations were promulgated under Title II of the Act and therefore do not apply to third-party billing services.  The FCC expressly recognized this limitation in adopting the Requirements.  See In re Truth-in-Billing and Billing Format, First Report and Order and Further Notice of Proposed Rulemaking, 1999 WL 292765, 14 F.C.C.R. 7492 (1999) ("TIB Order").  Citing the Detariffing Order, the FCC found in the TIB Order that "[t]he Commission has previously stated that it has jurisdiction under Title II to regulate the manner in which a carrier bills and collects for its own interstate [communications] offerings." Id. at 7506. On this basis, the FCC concluded that the Requirements "apply to the carrier providing service to customers, not to those carrier's billing agents," and identified LECs as among the "billing agents" excluded from the Requirements.  Id.  The allegedly unauthorized charges at issue here are for services provided by third-parties, not Defendants, and thus the Truth-in-Billing Requirements do not apply.

In their Opposition, Plaintiffs do not dispute that billing and collection services provided by LECs are not subject to regulation under Title II of the Act.  Rather, they argue that Defendants sometimes "purchase the accounts receivable" from third-parties and then bill and collect from those customers directly.  (Plfs.' Opp. at 19.)  Plaintiffs then characterize Defendants' billing under these accounts receivable as "billing and collecting on behalf of"

themselves.  (Id.)  This conduct, Plaintiffs allege, thus falls under Title II.  However, Plaintiffs cite no authority to support this position.  Indeed, irrespective of whether Defendants buy the third-party accounts receivable, charge a flat fee per third-party service, or keep a percentage of the billing for a third-party service, the fact remains that the services being billed for are those of a third-party, which are not subject to Title II.

Because a Tile II claim cannot lie under Plaintiffs' theory of the case, Plaintiffs' Third Cause of Action must be dismissed, without leave to amend, for failing to state a claim.  See Schreiber Distributing Co. v. Serv-Well Furniture Co., Inc., 806 F.2d 1393, 1401 (9th Cir. 1986) (dismissal without leave to amend appropriate if court determines that "the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency.").

## C.  PLAINTIFFS' STATE LAW CLAIMS ARE NOT BARRED BY SECTION 1759

Plaintiffs premise their state law claims on California Public Utilities Code § 2106, which provides for a private right of action against a public utility:

> Any public utility which does, causes to be done, or permits any act, matter, or thing prohibited or declared unlawful, or which omits to do any act, matter, or thing required to be done, either by the Constitution, any law of this State, or any order or decision of the commission, shall be liable to the persons or corporations affected thereby for all loss, damages, or injury caused thereby or resulting therefrom…. An action to recover for such loss, damage, or injury may be brought in any court of competent jurisdiction by any corporation or person.

In their motion, Defendants argue that all of Plaintiffs' state law claims are barred by California Public Utilities Code § 1759 because Plaintiffs' theory of liability would interfere with the Commission's regulatory policy on cramming.  Section 1759 provides:

> No court of this state, except the Supreme Court and the court of appeal … shall have jurisdiction to review, reverse, correct, or annul any order or decision of the [public utilities] commission or to suspend or delay the execution or operation thereof, or to enjoin, restrain, or interfere with the commission in the performance of its official duties ….

As explained by the California Court of Appeal in Cundiff v. GTE California Inc., 101 Cal.App.4th 1395, 1405 (2002), "[s]ection 2106 and section 1759 address different things. Section 1759 defines and limits the power of courts to pass judgment on, or interfere with,

what the commission does.  Section 2106, on the other hand, confirms the full power of the courts to pass judgment on what utilities do."  The <u>Cundiff</u> court further explained that "[t]he similarity between the two statutes is that they both dictate which courts have jurisdiction to engage in these activities.  Only appellate courts can review decisions and orders of the commission and interfere with its actions, whereas suits for relief against utilities can be brought in the trial court."  <u>Id</u>.

However, as noted by the <u>Cundiff</u> court, the California Supreme Court has recognized that a plaintiff's attempt to obtain relief under Section 2106 may have the effect of interfering with the commission's regulation of utilities.  Specifically, in <u>Waters v. Pacific Telephone Co</u>., 12 Cal.3d 1, 4 (1974), the court stated that Section 2106 "must be construed as limited to those situations in which an award of damages would not hinder or frustrate the commission's declared supervisory and regulatory policies."  A subsequent California Supreme Court decision stated:  "Under the <u>Waters</u> rule, ... an action for damages against a public utility pursuant to section 2106 is barred by section 1759 not only when an award of damages would directly contravene a specific order or decision of the commission, i.e., when it would 'reverse, correct, or annul' that order or decision, but also when an award of damages would simply have the effect of undermining a general supervisory or regulatory policy of the commission, i.e., when it would 'hinder' or 'frustrate' or 'interfere with' or 'obstruct' that policy."  <u>San Diego Gas & Electric Co. v. Superior Court ("Covalt")</u>, 13 Cal.4th 893, 918 (1996).

In determining whether Section 1759 bars a plaintiffs' claims, a three-part test is applied: (1) whether the Commission had the authority to regulate the conduct at issue; (2) whether the Commission had exercised that authority; and (3) whether the court action would hinder or interfere with the Commission's exercise of regulatory authority with respect to the conduct at issue.  <u>Hartwell Corp. v. Superior Court</u>, 27 Cal.4th 256, 266 (2002) (citing <u>Covalt</u>, 13 Cal.4th at 923, 926, 935).

Here, the parties do not dispute that the first two prongs of this test are met.  First, the Commission has the authority to regulate third-party billing services under Public Utilties Code §§ 2889.9 and 2890, which authorize the Commission to adopt rules and regulations to

safeguard consumers against cramming.  Second, the Commission has exercised its authority in issuing the 2000 Cramming Rules, the 2001 Interim Non-Com Rules, and the 2006 Cramming Rules.  However, the parties dispute the third prong, i.e., whether a finding of liability against Defendants in this action would hinder or interfere with the Commission's exercise of regulatory authority with respect to cramming.

> ### 1.  The Commission Has Expressly Indicated that Trial Courts Should Have Concurrent Jurisdiction Over Actions Based on Cramming

On this point, the Commission has repeatedly opined that a trial court's exercise of subject matter jurisdiction over actions based on cramming would not interfere with or obstruct it in the performance of its official duties.  The Commission has concluded that trial courts should have concurrent jurisdiction.

Specifically, in Section G(13) of the "Interim Non-Com Rules," entitled "Complaint Procedures," the Commission explained:  "Nothing in these rules preclude a subscriber that has been the victim of cramming … from pursuing <u>other legal remedies</u> and obtaining relief that the subscriber may be entitled to under state or federal law."  (Ring Decl., Ex. F. at A-16 (Interim Non-Com Rules)) (emphasis added).

In addition, the Interim Decision Issuing General Order 168, in the section entitled "Enforcement," the Commission observed:  "Consumer parties … would support civil actions against carriers when their activities violate consumer's rights.  The Commission, they believe, should make clear that courts have concurrent jurisdiction to remedy consumer fraud and other violations of the law by carriers subject to the Commission's jurisdiction."  <u>Interim Decision Issuing General Order 168, Rules Governing Telecommunications Consumer Protection</u>, 2004 WL 1375707 at 58, D.04-05-057 (Ca.P.U.C. May 27, 2004) ("Interim Decision"). [6]  The Commission then stated in the Interim Decision: "Our new rules, which are based upon the Commission's authority under the Constitution and the Public Utilities Code (particularly Sections ... 2889.9-2894.10), are not, in fact, intended to insulate public utilities from liability

---

[6] The Interim Decision was not cited by either party.  However, along with the other Commission decisions relied upon by Defendants, the Court takes judicial notice of this decision.

under other statutory schemes such as the Unfair Competition Law.  The Public Utilities Code provides that public utilities subject to the Commission's jurisdiction remain subject to other statutory schemes as well, whether those laws are enforced by the Commission or by the courts."  Id.

The Commission concluded: "Thus, we agree with those parties who state that the Commission and the courts have concurrent jurisdiction over consumer protection matters, in the sense that public utilities are subject to standards and requirements enforced by the Commission and to consumer protection laws enforced by the courts.  A business practice that violates the Public Utilities Code and our consumer protection rules ..., for example, ... cramming ... will likely also constitute an unfair and unlawful business practice under the Unfair Competition Law, and subject the offending utility to possible court-imposed sanctions under that law.  Accordingly, we have added the following statement under Applicability in Part 2: … [']The Commission intends to continue its policy of cooperating with law enforcement authorities to enforce consumer protection laws that prohibit misleading advertising and other unfair business practices.  These rules do not preclude any civil action that may be available by law.  The remedies the Commission may impose for violations of these rules are not intended to displace other remedies that may be imposed by the courts for violation of consumer protection laws.[']"  Id. at 59 (fn. omitted and emphasis added).

Furthermore, in General Order No. 168 itself, in the section entitled "Consumer Protection Rules," the Commission also stated: "Prosecution, whether civil or criminal, by any local or state law enforcement agency to enforce any consumer protection ... law does not interfere with any Commission policy, order or decision, or the performance of any duty of the Commission, related to the enactment or enforcement of these rules."  Id. at 81.

The Commission reinforced its view that trial courts should have concurrent jurisdiction over cramming complaints in its subsequent 2006 Cramming Rules (D.06-03-013), by stating "[l]aws of general applicability, such as contract law and Bus. & Prof. Code § 1700, also shield consumers from liability for unauthorized charges."  (Ring Decl., Ex. G, p. 89, n. 250) (2006 Cramming Rules).

However, General Order No. 168 also states: "These rules are not intended to create a private right of action to impose liability on carriers of other utilities for damages, which liability would not exist had these rights not been adopted." Id. at 81.  On this point, Plaintiffs' state law claims are not premised upon violation of any specific rule promulgated by the Commission.  Instead, the gravamen of Plaintiffs' state law claims is that Defendants billed and collected for unauthorized charges, in violation of Public Utilities Code Section 2890(a), which imposes a requirement upon public telephone utilities, independent of the Commission's rules: "A telephone bill may only contain charges for products or services, the purchase of which the subscriber has authorized."  Cal. Pub. Util. Code § 2890(a).  (See FAC, ¶¶ 139, 140, 146, 153, 159, 167.)

The fact that the Commission itself has opined that trial courts should have concurrent jurisdiction over cramming complaints is a compelling indicator that an action based upon alleged cramming practices will not hinder or interfere with the Commission in the performance of its official duties.  Department of Health & Human Services v. Chater, 163 F.3d 1129, 1133 (9th Cir. 1998) (courts "must give substantial deference to an agency's interpretation of its own regulations because its expertise makes it well-suited to interpret the language."); cf. In re Jamster Marketing Litigation, 2009 WL 1456632, 5 (S.D. Cal. 2009) (rejecting defendant's argument that Section 1759 precluded plaintiff's claims, because defendant "fail[ed] to cite any authority that the Public Utilities Code precludes state law claims brought pursuant to California's Unfair Competition law ….").

## 2. The Other Authority Cited by Defendants Fails to Support the Conclusion that Section 1759 Bars Plaintiffs' Claims

As indicated, the decisions of the Commission support the conclusion that Plaintiffs' action would not interfere with or obstruct the Commission in the performance of its official duties.  The case law relied upon by Defendants does not lead to a contrary conclusion.  Specifically, in Hartwell Corp. v. Superior Court, 27 Cal.4th 256, 264 (2002), plaintiffs sued water companies regulated by the Commission, alleging that they had provided contaminated well water to the plaintiffs.  Id. at 260-261.  The Commission had adopted California

Department of Health Services (DHS) standards for water safety and followed those standards in determining what measures the water companies should undertake to maintain water purity. Id. at 272, 276.  The court held the plaintiffs could pursue claims based on the theory that the defendant utility failed to meet the DHS standards because "a jury award…would not interfere with the PUC regulatory policy requiring water utility compliance with those standards."  Id. at 276.  On the other hand, plaintiffs' claims based on the theory that the defendant utility provided unhealthy water, even if that water actually met the DHS standards, were barred by Section 1759.  Id. at 276.  In so finding, the court held that a "superior court determination of the inadequacy of a DHS water quality standard applied by the PUC would not only call DHS regulation into question, it would also undermine the propriety of a PUC ratemaking determination."  Id.

Citing Hartwell, Defendants argue that Plaintiffs' claims are barred by Section 1759 because a finding of liability would interfere with the Commission's regulatory policies and rulemaking, and would amount to a finding that the Commission's anti-cramming polices are inadequate.  That argument is not persuasive.  According to the Historical and Statutory Notes to Section 2890, it was the intent of the Legislature in promulgating Section 2890 to "(a) [r]educe the inclusion of unauthorized charges on a telephone subscriber's bill, a practice known as 'cramming';" "(b) [c]larify the rights and remedies available to California consumers with regard to telephone billing disputes;" and "(c) [p]rovide California consumers with a consistent, effective, and easily accessible means of resolving disputes over unauthorized, inadvertent, misleading, or fraudulent charges that appear on their telephone bills."  Cal. Pub. Util. Code § 2890; Stats. 1998, ch. 1041, § 1 (Sen. Bill No. 378).

As such, this Court concludes that Plaintiffs' suit would not undermine the legislative intent of creating an effective and easily accessible means of resolving cramming disputes.  Rather, it would aid that legislative intent.  In that regard, this case is more analogous to Cundiff v. GTE California Inc., 101 Cal. App. 4th 1395 (2002).  In Cundiff, plaintiffs brought unfair competition and false advertising claims against telephone companies, alleging that they misrepresented rental charges for "obsolete and non-existent" telephones on bills by describing

them in a misleading manner as "equipment rental charges." Id. at 1400.  A 1985 Commission decision had allowed telephone companies to continue renting telephones to customers, even though deregulation of the industry allowed customers to purchase telephones from other sources.  The Commission had issued a "customer advisory," advising customers to review their telephone bills to see if they were being charged for an unwanted rental telephone.  Id. at 1404-1405.  The Cundiff court held that plaintiffs' claims were not barred by Section 1759 because, in part, the suit would actually further the Commission's desire, as reflected in its customer advisory, that consumers be fully informed about charges they may be paying for rental of their telephones.  Id. at 1408; see also Hartwell, 27 Cal.4th at 275 ("superior courts are not precluded from acting in aid of, rather than in derogation of, the PUC's jurisdiction.").

Having found that Plaintiffs' state law claims are not barred by Section 1759, the Court next turns to the other arguments Defendants make in favor of dismissal of those claims.

**D.     PLAINTIFFS' STATE LAW CLAIMS**

**1.     Breach of Contract (Fourth Cause of Action) and Tortious Interference with Contract (Fifth Cause of Action)**

Plaintiffs allege in their Fourth Cause of Action that Plaintiffs and the statewide Sub-Class "entered into agreements with Verizon California," whereby Verizon California "expressly and/or impliedly agreed to bill and collect only for such charges that Plaintiffs and the Sub-Class clearly and explicitly authorized," and "expressly and/or impliedly agreed to provide clear and non-misleading telephone bills to Plaintiffs and the Sub-Class."  (FAC, ¶¶ 136, 138.)  Plaintiffs further allege that Defendant Verizon California breached its contractual obligations by billing and collecting for products and services that were never purchased or authorized, and by providing telephone bills that were unclear and misleading.  (Id., ¶¶ 139-140.)

By their Tortious Interference with Contract Claim, brought on behalf of all Plaintiffs against all Defendants except the Verizon LECs, Plaintiffs allege that these Defendants intentionally interfered with Plaintiffs' contractual relationships with the Verizon LECs "through improper motives and/or means by knowingly and/or recklessly continually causing

to be placed on the class members' bills across the nation unauthorized charges." (Id., ¶¶ 145-146.)

Defendants argue that Plaintiffs' claims for breach of contract and tortious interference fail "because Verizon California has no contractual obligation to Plaintiffs to guarantee unauthorized charges will never appear on their bills." (Defs.' Mtn. at 14.)  Relying on one small portion of the Verizon California Local Exchange Tariff filed with the Commission ("Schedule D&R – Definitions and Rules"), Defendants assert that no portion of the tariff addresses third-party billing or imposes on Verizon California an obligation to prevent unauthorized charges from appearing on bills.  (Ring Decl., Ex. I.)  It is true that a "tariff … is the document that governs the rights and liabilities between a public utility … and its customers."  Pink Dot, Inc. v. Teleport Communications Group, 89 Cal.App.4th 407, 410 n. 1 (2001) (citing Cal. Pub. Util. Code § 489(a)).  However, the remainder of the tariff has not been placed before this Court.  At the pleading stage, to state a claim for breach of contract, a plaintiff must allege: (1) a contract; (2) plaintiff's performance of the contract; (3) defendant's breach; (4) resulting damage to the plaintiff.  McDonald v. John P. Scripps Newspaper, 210 Cal.App.3d 100, 104 (1989).  Plaintiffs have done that here.  Whether Plaintiffs can prove Defendants' billing practices breach a contractual obligation is a question left for a summary judgment motion or trial; it is not appropriate to "test the evidence at this stage."  In re GlenFed, Inc. Securities Litigation, 42 F.3d 1541, 1550 (9th Cir. 1994) (superseded in part by statute, In re Vantive Corp. Sec. Litig., 283 F.3d 1079, 1091 (9th Cir. 2002)).

As such, Defendants' Rule 12(b)(6) challenge to Plaintiffs' breach of contract and tortious interference claims fails.

### 2.    Breach of Trust (Sixth Cause of Action)

By this claim, Plaintiffs allege that Defendants received highly personal information from Plaintiffs, and was bound by fiduciary duties to hold that information in trust.  (FAC, ¶¶ 150-152.)  Plaintiffs further allege that Defendants violated that trust by using the information it obtained in confidence to impose charges on customers in which Defendants had a financial interest.  (Id., ¶ 153.)

Defendants are correct that Plaintiffs fail to state a claim because they allege no facts giving rise to a fiduciary duty. "'[B]efore a person can be charged with a fiduciary obligation, he must either knowingly undertake to act on behalf and for the benefit of another, or must enter into a relationship which imposes that undertaking as a matter of law.'" City of Hope Nat. Med. Ctr v. Genentech, Inc., 43 Cal. 4th 375, 386 (2008). To satisfy the "knowingly undertake" requirement, Plaintiffs must show that Defendants "entered into [the contractual relationship] with the view of acting primarily for the benefit of [Plaintiffs]" and "subordinat[ing] its interests to those of [plaintiffs]." Id. Plaintiffs do not allege such a relationship. Instead, they allege a mutually beneficial contractual relationship in which Defendants received "a certain sum of money" in exchange for Plaintiffs' receipt of "local wireline telephone" services. (FAC, ¶ 135.)

Plaintiffs also fail to allege any kind of relationship that imposes fiduciary obligations as a matter of law. See City Solutions, Inc. v. Clear Channel Commc'ns, Inc., 201 F. Supp. 2d 1048, 1050 (N.D. Cal. 2002) ("The mere fact that in the course of their business relationships the parties reposed trust and confidence in each other does not impose any corresponding fiduciary duty.") Courts have accordingly held telephone companies do not owe a fiduciary relationship to their customers. See McDonnel Douglas Corp. v. General Tel. Co. of Cal., 594 F.2d 720, 725 (9th Cir. 1979) (telephone company did not owe a fiduciary duty to customers to bill for services in a certain manner); Simpson v. US West Commc'ns, Inc., 957 F. Supp. 201, 206 (D. Or. 1997) (finding that "a telephone company is not in a fiduciary relationship with its customers.").

For these reasons, Plaintiffs have failed to state a claim for breach of trust.

### 3. Violation of California Public Utilities Code § 2890 (Seventh Cause of Action)

The statewide Sub-Class alleges that Verizon California violated California Public Utilities Code Section 2890, which provides that a "telephone bill may only contain charges for products and services, the purchase of which the subscriber has authorized." Cal. Pub. Util. Code § 2890(a). According to Plaintiffs, Verizon California violated Section 2890(a) by

1   including in its bills unauthorized third-party charges.  Plaintiffs also allege that Verizon

2   California violated Section 2890(d), which sets forth billing disclosure requirements, by failing

3   to include a "clear and concise description of the service, product, or other offering for which a

4   charge has been imposed" or "a description of the manner in which a dispute regarding the

5   charge may be addressed."  (FAC, ¶ 161.)

6         With respect to Plaintiffs' Section 2890(a) allegations, Defendants argue that these fail

7   because that section does not impose liability on LECs for unauthorized charges that appear on

8   a bill.  Rather, it imposes that liability on the third-party responsible for generating the charge.

9   However, Defendants have cited no authority in support of that argument.  Instead, Defendants

10  cite other provisions of Section 2890 that refer to the respective duties of a "billing telephone

11  company" and "entities responsible for generating a charge," noting that these entities "are

12  responsible to undertake to resolve the billing dispute to the subscribers satisfaction."  Cal.

13  Pub. Util. Code § 2890(e).  Regardless of the other provisions of Section 2890, Section 2890(a)

14  clearly prohibits the placement of unauthorized charges on a bill, and makes no distinction

15  between  "billing telephone company" and "entities responsible for generating a charge" in that

16  prohibition.

17        As for Plaintiffs' Section 2890(d) allegations, Defendants argue that those fail as a

18  matter of law because – for the disputed charges – the telephone bills of the named Plaintiffs

19  include a brief description of the charged service (i.e., "Voiceexpress Voicemail"), the third-

20  party responsible for the charge, and a toll free number that can be contacted for billing

21  questions.  (Ring Decl., Exs. A-D.) While, as indicated above, the Court is permitted to

22  consider these documents on a Rule 12(b)(6) motion, at this stage of the proceedings, any

23  ambiguity in the documents must be resolved in Plaintiffs' favor.  See International Audio-text

24  Network, Inc. v. AT&T Co. 62 F.3d 69, 72 (2nd Cir. 1995).  There remains ambiguity as to

25  whether these descriptions are sufficiently "clear and concise" and otherwise comply with

26  Section 2890(d).

27        For these reasons, Defendants' challenge to Plaintiffs' Seventh Cause of Action is

28  without merit.

**4.      Violation of California Business and Professions Code §§ 17200, *et seq.* (Unfair Business Practices Act) (Eighth Cause of Action)**

The statewide Sub-Class alleges that Defendants violated the Unfair Business Practices Act "through their conduct" described in the Complaint, "including their violations of the California Public Utilities Code Section 2890." (FAC, ¶¶ 166-168.)  The Act proscribes unfair business competition and defines the same to include any "unfair," "unlawful," or "fraudulent" business act or practice.  Cal. Bus. & Prof. Code §§ 17200, *et seq.*

Defendants challenge this claim on the ground that Plaintiffs have not sufficiently alleged any fraudulent act or a violation of Section 2890.  For the reasons stated above, Plaintiffs have sufficiently plead a RICO fraud claim and a claim for violation of Section 2890. Therefore, Defendants' motion to dismiss Plaintiffs' Eighth Cause of Action is denied.

**E.      DEFENDANTS' PRIMARY JURISDICTION ARGUMENT**

As a final matter, Defendants assert that if the Court determines that Plaintiffs' claims do not fail as a matter of law, they should be referred to the Commission and/or the FCC under the doctrine of primary jurisdiction.

The primary jurisdiction doctrine allows courts to stay proceedings or to dismiss a complaint without prejudice pending the resolution of an issue within the special competence of an administrative agency.  Clark v. Time Warner Cable, 523 F.3d 1110, 1114 (9th Cir. 2008).  "A court's invocation of the doctrine does not indicate that it lacks jurisdiction." Id. "Rather, the doctrine is a 'prudential' one, under which a court determines that an otherwise cognizable claim implicates technical and policy questions that should be addressed in the first instance by the agency with regulatory authority over the relevant industry rather than by the judicial branch." Id.  Primary jurisdiction applies in a limited set of circumstances.  Id.  The doctrine is not designed to "secure expert advice" from agencies "every time a court is presented with an issue conceivably within the agency's ambit."  Brown v. MCI WorldCom Network Servs., 277 F.3d 1166, 1172 (9th Cir. 2002) (internal quotation marks and citation omitted).  "Instead, it is to be used only if a claim requires resolution of an issue of first impression, or of a particularly complicated issue that Congress has committed to a regulatory

agency, …. and if protection of the integrity of a regulatory scheme dictates preliminary resort to the agency which administers the scheme." <u>Clark</u>, 523 F.3d at 1114 (internal quotation marks and citation omitted) (emphasis added).

Here, Defendants argue that referral to the Commission and/or FCC is appropriate because those agencies have expert authority over cramming, and they are engaged in ongoing proceedings to evaluate their policies on cramming.  However, as indicated above, the Commission has repeatedly expressed a desire for trial courts to have concurrent jurisdiction over complaints related to cramming.  Moreover, the primary case relied on by Defendants, <u>Clark</u>, is readily distinguishable because, there, the court was faced with a question of first impression regarding whether a provider of a new communications technology (namely, a voice over IP provider) qualified as a "telecommunication carrier" under FCC regulations. <u>Clark</u>, 523 F.3d at 1115.  The <u>Clark</u> court referred the issue to the FCC because that agency was "actively considering how it will regulate VoIP services." <u>Id</u>.  This case does not involve any issues of first impression or novel questions that require agency expertise for resolution. Accordingly, Defendants' motion in this regard is denied.

## III.   <u>CONCLUSION</u>

For the above stated reasons, IT IS HEREBY ORDERED THAT:

1.   Defendants' Motion to Dismiss Plaintiffs' Third Cause of Action (Violations of 47 U.S.C. §§ 201, *et seq*., and 47 C.F.R. § 64.2401) is GRANTED.  Plaintiffs' Third Cause of Action is dismissed without leave to amend.

2.   Defendants' Motion to Dismiss Plaintiffs' Sixth Cause of Action (Breach of Trust) is GRANTED.  Plaintiffs' Sixth Cause of Action is dismissed with leave to amend.  Plaintiffs shall have twenty-five (25) days from the date of this Order to file a second amended complaint.

3.   Defendants' Motion to Dismiss First Amended Complaint is DENIED in all other respects.

4.   This Order terminates Docket Nos. 43, 44-1, 53, and 56.

IT IS SO ORDERED.

1   Dated: 9/3/10

2                                              _____
                                               SAUNDRA BROWN ARMSTRONG
3                                              United States District Judge

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28