# EXHIBIT 3

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FEDERAL TRADE COMMISSION, | No. C 10-00022 WHA |
| Plaintiff, | |
| v. | **ORDER ON PENDING MOTIONS REGARDING THE JUDGMENT, PERMANENT INJUNCTION, AND CONSUMER REDRESS PLAN** |
| INC21.COM CORPORATION, *et al.*, | |
| Defendants. | |

## INTRODUCTION

In this enforcement action involving fraudulent charges placed on thousands of telephone bills, defendants move to stay the permanent injunction and enforcement of the judgment pending appeal, dispense with the requirement of a supersedeas bond pursuant to FRCP 62(d), reinstate monthly stipends for individual defendants Roy and John Lin pending appeal, and authorize an additional release of over $90,000 in funds for attorney's fees. The Federal Trade Commission, in addition to opposing these requests by defense counsel, also moves pursuant to FRCP 59(e) to amend the injunction with respect to the consumer redress plan. According to the FTC, it will be "nearly impossible" to implement a claim-based redress plan due to the manner in which billing records have been maintained. Additionally, the FTC contends that such a redress plan would be impractical given the shortage of funds available for consumer redress. As a counterproposal, the FTC suggests that a *pro rata* redress plan be authorized where defrauded consumers would not be

1  required to submit claim forms. For the reasons set forth below, defendants' motion is **GRANTED**
2  **IN PART** and **DENIED IN PART**. As for the FTC's proposed *pro rata* redress plan, further briefing
3  is required to properly assess its merits.

### STATEMENT

The intricate details of the LEC-billing scheme underlying the instant enforcement action were covered in depth in the order on the parties' cross-motions for summary judgment, issued on September 21, 2010 (Dkt. No. 162). Judgment was entered that same day against defendants and in favor of the FTC in the amount of $37,970,929.57 in restitution owed to thousands of defrauded consumers (Dkt. No. 163). Permanent injunctive relief was also ordered to prevent defendants from continuing their unlawful telemarketing and LEC-billing practices. Only the relevant details of the September 21 order and accompanying judgment will be repeated here.

The bulk of the instant filings pertains to the injunctive relief and consumer redress plan ordered on September 21. In particular, the following terms of the permanent injunction are targeted by both sides (Dkt. No. 162 at 42–43):

> 3. All LECs and billing aggregators who have collected payments on behalf of defendants and have held those payments in escrow shall issue direct refunds to customers from whom the funds were collected. No fees may be deducted from these refunds. All refunds shall be accompanied by a written explanation that the Court has ordered the refund and suspended any further LEC billing with respect to defendants' products and services. The notice should advise that if the customer desires to continue receiving defendants' services, then the customer should contact defendants and make direct-pay billing arrangements. Once these refunds have been issued, the LEC or billing aggregator must file a declaration with the Court (under seal if necessary) setting forth the dollar amounts of each refund and the recipient of each refund. These declarations must also be served on defendants and the FTC to ensure that these customers are not provided with excessive refunds. Any amounts held in escrow that, for whatever reason, cannot be refunded directly (perhaps because the customer cannot be located) shall be paid to the FTC and applied against the restitution amount awarded herein.
>
> \*         \*         \*
>
> 5. Individual defendants Roy and John Lin shall no longer be entitled to monthly stipends for living expenses from the funds deposited in the Court's registry. Such funds shall be applied against the restitution ordered in this action. The FTC shall submit a proposed order by October 7, 2010, directing the

transfer of these funds from the Court's registry to the FTC in satisfaction of the judgment.

Additionally, the parties dispute the following portion of the September 21 order, which addressed the consumer redress plan for returning over $37,970,929.57 in fraudulently billed charges to thousands of consumers (*id.* at 47):

> Counsel shall meet and confer and submit a plan of notice and distribution of these funds to defendants' current and former customers by October 7, 2010. As stated at the hearing, refunds must be limited to customers who acknowledge, under penalty of perjury, that they were billed without authorization by defendants and are entitled to the refund amount presented to them. Any claim form mailed to customers must clearly set forth — based upon billing records obtained from LECs, billing aggregators, and defendants — the total amount that the customer was supposedly charged, the total amount that the customer supposedly paid to defendants, the total amount of refunds (if any) that have already been issued to the customer, and the total amount of restitution to which the customer is entitled. Any undistributed amounts shall be distributed as per future court order.

\* \* \*

Following the issuance of the September 21 order and the entry of judgment, defendants filed a timely motion to stay the permanent injunction and enforcement of the judgment pending appeal, dispense with the requirement of a supersedeas bond pursuant to FRCP 62(d), reinstate monthly stipends for individual defendants Roy and John Lin pending appeal, and authorize an additional release of $91,509.50 in funds for attorney's fees (Dkt. No. 164). Defendants' motion took particular issue with the portion of the permanent injunction authorizing direct refunds to be immediately issued to consumers by local exchange carriers ("LECs") and billing aggregators using funds collected and held in escrow during this litigation. In response, a briefing schedule was immediate set forth and the portion of the permanent injunction directing LECs and billing aggregators to issue direct refunds was stayed pending the resolution of defendants' motion (Dkt. No. 165). The same order invited the FTC to voice any of its own concerns surrounding the equitable relief detailed in the September 21 order. The FTC accepted this invitation. In addition to filing a timely opposition to defendants' motion, the FTC moved for its own amendment of the September 21 order pursuant to FRCP 59(e) (Dkt. No. 172). Defendants then filed a timely reply.

3

**ANALYSIS**

This order will first address the various requests for relief sought by defendants, beginning with the one requested amendment to the September 21 order which both sides agree is proper. The parties' dispute over the details of the consumer redress plan will be addressed last.

### 1. DIRECT REFUNDS OF ESCROWED FUNDS BY LECS AND AGGREGATORS

The September 21 order directed LECs and billing aggregators who have been collecting payments on behalf of defendants and holding those payments in escrow pending the resolution of this litigation to issue direct and immediate refunds to defrauded customers (Dkt. No. 162 at 42). The reasoning behind this directive was grounded in simplicity and efficiency. The undersigned judge believed that since LECs and billing aggregators presumably maintained detailed records tracing exactly where these escrowed funds had come from, issuing refunds directly to consumers would avoid the circuitous process of transferring these funds to the FTC and having paper checks issued. These consumers would simply receive a "credit" on their telephone bills.

According to both sides, however, issuing direct refunds would not be a simple and efficient undertaking. *First*, both the FTC and defendants stated in their respective briefs that the billing aggregators who have been collecting these payments cannot issue direct refunds to consumers because they lack sufficiently detailed records to trace escrowed funds to individual billed telephone numbers (Br. 8; Opp. 14; Dkt. No. 143-3 at 5). In particular, the funds that are being held in escrow are based on a percentage of gross deposits and *not* tied to specific accounts. Additionally, the FTC also noted in its brief that the total amount of funds that are expected to be available to satisfy the judgment will only add up to a *small fraction* of the $37,970,929.57 in restitution ordered. Specifically, the FTC expects that only around eight million dollars will be available for consumer redress. Given this significant shortfall in funds, the FTC argues that it would be more equitable to all defrauded consumers to transfer the escrowed funds (totaling nearly two million dollars) into a central pool that can be used to effectuate a *pro rata* consumer redress program.

This order agrees. Given the limited amount of funds that are expected to be available to reimburse defrauded consumers, transferring these escrowed funds to the FTC will allow victims

4

to share equally and equitably in the fund of pooled assets. Accordingly, paragraph three of the permanent injunction as set forth in the September 21 order is hereby **AMENDED** as follows:

> 3. All LECs and billing aggregators who have collected payments on behalf of defendants and have held those payments in escrow shall pay these funds to the FTC for use in a consumer redress program. No fees may be deducted from these amounts held in escrow. No direct refunds shall be issued to consumers by LECs or billing aggregators using these escrowed funds. Consumer refunds shall be handled exclusively through the consumer redress program administered by the FTC. Any and all funds paid to the FTC shall be applied against the restitution amount awarded herein.

## 2. DEFENDANTS' REQUEST TO STAY THE INJUNCTION AND JUDGMENT

Defendants request a stay of the permanent injunction and enforcement of the judgment pending the resolution of motions that defense counsel intend to file pursuant to FRCP 59 and 60 (Br. 3–4). Alternatively, defendants request that the requirement of a supersedeas bond pursuant to FRCP 62(d) be waived in light of the asset freeze and seizure of defendants' property in the related civil forfeiture action, and that a stay of the permanent injunction and enforcement of the judgment be issued pending the filing of a notice of appeal.

A district court has discretion to stay the enforcement of judgment "'as part of its traditional equipment for the administration of justice.'" *Nken v. Holder*, ---- U.S. ----, ----, 129 S.Ct. 1749, 1754 (2009) (quoting *Scripps-Howard Radio, Inc. v. FCC*, 316 U.S. 4, 9 (1942)). Four factors must be weighed to determine whether a stay is warranted: (1) whether the stay applicant has made a strong showing that he or she is likely to succeed on the merits, (2) whether the applicant will be irreparably injured absent a stay, (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding, and (4) where the public interest lies. *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987). Of these factors, the first two are "the most critical" to the analysis. *Nken*, 129 S.Ct. at 1761.

### A. Factor One: The Likelihood of Success on the Merits

Defendants have not established a likelihood of success on the merits. As detailed in the September 21 order, the evidence submitted by the FTC in support of its motion for summary judgment overwhelmingly demonstrated that defendants were liable for violating both the FTC Act and the Telemarketing Sales Rule. Defendants failed to raise any genuine issues of material

5

fact in their opposition to the FTC's summary judgment motion, and none of defendants' arguments raised in the instant motion demonstrates any errors of fact or law in the September 21 order.

*First*, contrary to defendants' contentions, the undersigned judge properly credited the testimony of Inc21 employee Michael Nelson, who testified that defendants' products were plagued with technical gremlins and that individual defendants Roy and John Lin were well aware that most of their customers were likely being defrauded. There were no *genuine* issues of material fact surrounding Mr. Nelson's testimony, and in any event, his testimony was not "heavily relied upon" by the September 21 order to establish liability.[1] Even absent the allegedly "disputed" portion of Mr. Nelson's testimony, there were mountains of unrebutted evidence demonstrating that defendants were liable for the conduct alleged in this action.

*Second*, defendants' criticisms regarding the reliability of the FTC's expert survey conducted by Howard Marylander come weeks too late. In the instant motion, defendants contend that Expert Marylander's survey results were (and still are) contradicted by "evidence" compiled by defendant John Lin supposedly showing that 70 percent of survey respondents actually received refunds from defendants. Based upon this "evidence," defendants argue that the Marylander survey should have been excluded and disregarded in its entirety, since the fact that five percent of survey respondents indicated that they were unaware that they had been billed by defendants is allegedly inconsistent with the supposed "evidence" that 70 percent of respondents were actually issued refunds.

Defendants, however, readily admit that they did not provide the Court with this "evidence" as part of their opposition to the FTC's summary judgment motion (Reply 4). Indeed, nowhere in defendants' summary judgment opposition brief was the "70 percent" argument even presented. In other words, this is a *new argument* based upon "evidence" that was not part of the

---

[1] Defendants contend — as defense counsel previously argued at the summary judgment hearing — that the testimony of Mr. Nelson was contradicted by declarations and testimony submitted by other Inc21 employees, particularly that of Collette Chien. The September 21 order directly addressed this allegedly "contradictory" evidence. Specifically, Ms. Chien's declaration only targeted *one aspect* of Mr. Nelson's testimony. It did not contradict the vast majority what Mr. Nelson stated at his deposition, and as explained in the September 21 order, failed to create any genuine issues of material fact.

6

summary judgment record. As a separate but related point, this order also emphasizes that defendants declined to depose Expert Marylander regarding his supposedly "unreliable" survey results, despite noticing his deposition two days prior to the end of the discovery period. For whatever reason, defense counsel cancelled the deposition of Expert Marylander on the same day that it was scheduled. Given these various points, the undersigned judge declines to give any weight to this newly proffered "evidence" that was *not* part of the summary judgment record, and to which the FTC had no opportunity to respond. Expert Marylander's survey was properly considered as evidence of defendants' widespread fraudulent conduct.

*Third*, even assuming, *arguendo*, that defrauded customers interviewed by Expert Marylander had actually received refunds from defendants prior to being interviewed, this would not have rendered the survey methodology so "unreliable" as to warrant its exclusion from evidence. Critically, evidence of supposed refunds would not have contradicted survey results showing that 97 percent of defendants' "customers" never agreed to purchase defendants' products and services, and 96 percent of these "customers" never received any services from defendants. These numbers alone justify the conclusions reached in the September 21 order.

*Fourth*, defendants' argument that the three-year statute of limitations applicable under Section 19 of the FTC Act should have been applied to the claims in the instant action fail for the reasons already set forth in the September 21 order. The FTC properly sought relief under Section 13(b) of the FTC Act, which does *not* contain a three-year statute of limitations period.

*Fifth*, the judgment entered against relief defendant Sheng Lin in the amount of $434,000 was proper and supported by ample evidence. Both Inc21's accountant, Kimberly Walch, and Sheng Lin himself testified at their depositions that he had been paid $134,000 in salary and $300,000 in "bonuses" from Inc21. These funds were paid to Sheng Lin directly from defendants' business accounts, which held the proceeds of defendants' unlawful conduct. This is sufficient to show that relief defendant Sheng Lin was paid with funds that were derived from defendants' unlawful scheme. *See FTC v. Network Services Depot*, ---- F.3d ----, ----, 2010 WL 3211724, at *11 (9th Cir. 2010). As such, the judgment entered against Sheng Lin was justified under both the summary judgment record and governing law.

7

*Sixth*, restitution in the amount of $37,970,929.57 was properly substantiated by the FTC. While it is true that the FTC corrected its calculations in its reply brief to its motion for summary judgment, this order emphasizes that defendants did not voice *any* criticisms whatsoever towards the FTC's original or revised calculations. In other words, defendants failed to present *any* contradictory evidence or alternative calculations at summary judgment, despite having full access to the billing records upon which the FTC's original calculations were based.[2] Additionally, defendants had ample opportunity to either move to strike defendants' revised calculations, object to the FTC's corrections, or move to file a sur-reply to the FTC's corrections. Indeed, the hearing date for the summary judgment motion was delayed for several weeks due to scheduling conflicts with counsel, creating a lengthy window of time for defendants to move for relief on this point. They did not. For these reasons, this order finds that the arguments and evidence presented in the instant motion targeting the $37,970,929.57 in restitution ordered on September 21 are both untimely and baseless.

*Seventh*, defendants' argument that this entire process has been somehow "fundamentally unfair" due to the freezing (and seizure in the related civil forfeiture case) of defendants' assets and an expedited discovery schedule does not raise any questions as to the merits of the September 21 order. *In fact, as that order noted, the expedited discovery schedule was set in motion at the request of defendants*. Additionally, the undersigned judge — at defendants' request and over the vocal objections of the FTC — allowed both Roy and John Lin to receive monthly stipends of $8,000 per month from frozen funds that might otherwise have been held for consumer redress (Dkt. No. 119). Finally, also over the objections of the FTC, a generous payment of $50,000 from frozen funds was authorized to compensate defense counsel (*ibid.*). These payments were probably more generous than required by due process, especially since they came out of the pockets of victims. In any event, defendants were always free to file a motion

---

[2] This order also emphasizes that the FTC's "corrections" in its reply brief were not based upon any new evidence. As such, even before the FTC made its corrections, defendants had the opportunity to examine the evidence upon which the FTC had based its original calculations, and could have proposed alternative calculations of a proper restitution amount. Defendants chose not to endeavor such an undertaking, and did not even realize that the FTC's original calculations contained an error until the FTC corrected it on its own.

8

pursuant to FRCP 56(f) to request additional discovery to oppose the FTC's motion for summary judgment. No such motion was ever filed.

For these reasons, this order finds that defendants have failed to demonstrate that post-judgment motions and an appeal of the September 21 order will likely succeed on the merits.

### B. Factor Two: The Risk of Irreparable Harm

In the instant motion, defendants stated that "one of the most compelling" arguments for granting a stay of the permanent injunction and enforcement of the judgment was "that portion of the refund methodology . . . that provides for direct refunds by the LECs and aggregators" (Br. 7–8). Since that portion of the permanent injunction has now been amended so that these funds will instead be transferred to the FTC and pooled with all consumer redress funds, this argument has been mooted. Defendants raise no other arguments demonstrating a risk of irreparable harm absent a stay of the permanent injunction and execution of the judgment, except in the event that the FTC is authorized to immediately implement a *pro rata* consumer redress plan without the need for defrauded customers to file claim forms. Since further briefing has been ordered on the details of such a consumer redress program, however, there is no risk whatsoever of any irreparable harm to defendants.

### C. Factors Three and Four: The Interests of Other Parties and the Public Interest

Since the two "most critical" factors in determining whether a stay is warranted weigh decidedly against granting defendants' motion to stay the permanent injunction and execution of the judgment, that alone is sufficient to deny defendants' request for a stay. *See Nken*, 129 S.Ct. at 1757. Nevertheless, this order will address the remaining two factors, as they also weigh strongly against the granting of a stay. *First*, there is no question that defrauded consumers — the "other parties" in this enforcement action — have a strong interest in obtaining prompt reimbursements of funds that have been fraudulently and unfairly collected from them by defendants. *Second*, this order emphasizes that the permanent injunction does not bar defendants from providing their services to legitimate customers. The permanent injunction only enjoins defendants from engaging in telemarketing activities and participating in the LEC-billing system. The public-at-large may still purchase and pay for defendants' products and services through

9

1 alternative channels. As such, both the interests of other parties and the public interest will not be
2 harmed by denying the stay.

### D. Waiver of the Supersedeas Bond Requirement Pursuant to FRCP 62(d)

Finally, for the same reasons discussed above, the undersigned judge declines to waive the requirement that a supersedeas bond be obtained pursuant to FRCP 62(d) to stay the judgment pending appeal. The purpose of requiring a judgment debtor to post a supersedeas bond is to ensure that the judgment creditor's interests are adequately protected during the appeals process. Here, the approximately eight million dollars of funds that are expected to be available for the FTC's consumer redress program fall far short of the 38 million dollars in restitution ordered. Staying the judgment (and the accompanying permanent injunction) would risk further depletion of these already limited funds. For these reasons, defendants' request to stay the permanent injunction and stay the execution of the judgment cannot be granted without the posting of a supersedeas bond in an amount *at least* commensurate with the amount of funds that are expected to be available for consumer redress.

\* \* \*

In sum, having considered the arguments proffered by both sides and after weighing the appropriate factors, this order finds that an entitlement to a stay of the permanent injunction and execution of the judgment — absent defendants' posting of an adequate supersedeas bond pursuant to FRCP 62(d) — has not been shown. Defendants request to stay the permanent injunction and the execution of the judgment is **DENIED**.

### 3. DEFENDANTS' REQUEST FOR MONTHLY STIPENDS FOR LIVING EXPENSES AND A SECOND PAYMENT OF ATTORNEY'S FEES

This order will neither reinstate monthly stipends for individual defendants Roy and John Lin pending appeal nor authorize a release of over $90,000 in consumer-redress funds to defense counsel. Defendants' checking accounts were properly frozen earlier this year to protect the interests of defrauded consumers following a compelling showing by the FTC that defendants had earned millions of dollars through unlawful billing practices. These funds will remain frozen pursuant to the September 21 order until they are transferred to the FTC in satisfaction of the judgment entered herein. The only payment that this order will authorize is **A ONE-TIME**

10

**ADDITIONAL DISBURSEMENT OF $10,000** from funds held in the Court's registry to defense counsel, Attorney Joel Dichter, for attorney's fees and expenses. Defendants' remaining requests to further deplete the already paltry amount of funds that will be available to reimburse harmed consumers are otherwise **DENIED**.

### 4. THE CONSUMER REDRESS PROGRAM

Turning now to the FTC's request to amend the procedural requirements of the consumer redress program as set forth in the September 21 order, further briefing is necessary to hammer out the details of a workable *pro rata* redress program.

The consumer redress program set forth in the September 21 order required the FTC to meet and confer with defense counsel and devise a notice and claims process whereby "refunds must be limited to customers who acknowledge, under penalty of perjury, that they were billed without authorization by defendants and are entitled to the refund amount presented to them" (Dkt. No. 162 at 47). The undersigned judge envisioned, based upon representations made at the summary judgment hearing, that the FTC would subpoena detailed billing records from numerous sources, including LECs, billing aggregators, and defendants themselves, to assemble a listing of each customer who was billed by defendants, the amount each customer was billed, the amount (if any) each customer actually paid, and the amount (if any) each customer received as credits or refunds. Based upon these calculations, the FTC would then present defrauded customers with claim forms that included calculations of their refunds. These customers would then be required to attest, to the best of their knowledge, that they were entitled to such a refund. Such a process would reasonably ensure that customers who had already received credits and refunds (or who did not pay defendants despite receiving a bill) would not receive a windfall.

Indeed, at the summary judgment hearing, counsel for the FTC — Attorney Sandhya Brown — assured the Court that such billing records could be obtained and such calculations could be made. Counsel apparently spoke too soon. As stated in the FTC's most recent filing, "[s]ince the entry of the Court's Order, counsel for the FTC has learned that the state of customer billing and payment records within the LEC billing system is even more complex that it had originally appeared, and would make compliance with the Court-ordered refund process nearly

11

1 impossible" (Opp. 12). Specifically, the FTC has apparently discovered that billing aggregators only possess the total billings and credits for each billed telephone number. They do *not* possess precise billing information for each individual owner of a billed telephone number who actually *paid* the charges (*see* Wolfe Decl. ¶ 5). Such information apparently only resides with the LECs, of which — according to the FTC — there are 1,375 operating across the country. Moreover, given that defendants "sold" some of their customers to a business partner named Jeff Lavino, a non-party who LEC-billed defendants' customers through his own business entities, the FTC would be required to repeat the subpoena process for all of Mr. Lavino's records. Given this backdrop, the FTC states that it would take "a gargantuan and time-consuming subpoena effort . . . to gather the information necessary just to *attempt* to determine the precise amounts paid by each of Inc21's customers" (Opp. 13) (emphasis in original).

The FTC also raises three additional points regarding the court-ordered redress program. *First*, the FTC predicts that many defrauded customers will not be able to attest, under penalty of perjury, that they are entitled to a refund. This is because many of these customers will be learning for the first time that they were even billed by defendants, and those who did not retain their phone bills will be unable to independently verify that they are entitled to a particular refund amount. *Second*, the FTC repeatedly emphasizes that only around eight million dollars will likely be available to reimburse defrauded consumers. Because of this shortfall, the FTC contends that the extra time and expense of a claim form process — which the FTC asserts would cost almost three times as much as sending two rounds of *pro rata* refund checks to consumers — would unnecessarily deplete the already limited funds available for consumer redress. *Third*, the FTC argues that under a *pro rata* redress program, where consumers will only receive pennies on the dollar in terms of refund checks, there is a greatly reduced likelihood that any consumer will receive a windfall. Based upon these various points, the FTC recommends that "the Court substitute the claims form process with a one-step distribution of *pro rata* checks to each reasonably identifiable victim in an amount not to exceed a *reasonable estimate* of that victim's losses" (*id.* at 16) (emphasis in original).

12

Having considered these arguments, the Court is inclined to agree with the FTC's proposal of implementing a *pro rata* check distribution process, given the comparatively small pool of funds available for consumer redress. That said, the details provided by the FTC as to how it intends to formulate a "reasonable estimate" of individual consumer losses has not been sufficiently explained. Indeed, determining whether an individual consumer is even entitled to a refund is exactly the concern raised by defense counsel, and is the primary basis for defendants' opposition to any deviation from the claim-form process set forth in the September 21 order (Reply 6). This is a legitimate concern, as the equitable relief authorized under the FTC Act must be limited to restitution.[3] Additionally, preventing windfall payments will ensure that *more* funds are available for defrauded consumers who are entitled to reimbursement checks.

For these reasons, the FTC is ordered to submit a reasonably detailed description of the process by which it will determine a "reasonable estimate" of individual consumer losses for a *pro rata* distribution of checks, and explain to the Court how this process — absent the use of a claim form — will reasonably ensure that consumers who have already received full or partial refunds (or never made any payments to defendants) will not receive windfall payments. To be clear, given the nature of billing records maintained by the various players in the LEC-billing system and the sheer number of defrauded consumers herein, the FTC is not required to submit a *perfect* procedure. LECs and billing aggregators, however, who were instruments of defendants' fraudulent scheme, are expected to do some leg work in helping reimbursement checks reach the proper consumers. Alongside this filing, the FTC shall also submit a proposed order setting forth the essential details of its *pro rata* redress program for the Court's approval. The FTC must submit these documents no later than **NOON ON THURSDAY, NOVEMBER 18, 2010**.

At least two weeks prior to the deadline for submitting these documents, counsel for the FTC shall provide defense counsel with a copy of its proposed *pro rata* redress plan. Both sides

---

[3] The concern over ensuring that individual consumers do not receive a windfall does not cast doubt over the propriety of the $37,970,929.57 in restitution set forth in the September 21 order and accompanying judgment. As stated in the September 21 order, the FTC properly "show[ed] that its calculations reasonably approximated" the net losses of defrauded consumers. The burden then shifted to defendants "to show that those figures [were] inaccurate." As noted herein and in the September 21 order, defendants did not even attempt to show that the FTC's figures were inaccurate.

13

1  must then meet and confer over the proposed plan at least one week prior to the submission
2  deadline. Defense counsel should take this opportunity to voice any relevant concerns over the
3  process (reserving all objections directed towards the use of a *pro rata* process in general) and to
4  provide additional records (if any exist) to the FTC evidencing credits or refunds that may have
5  been issued to particular customers.[4] Defense counsel may then lodge objections to the FTC's
6  proposed *pro rata* redress plan **BY NOON ON TUESDAY, NOVEMBER 23, 2010**.

Until and unless a consumer redress program is approved, no refund checks may be issued to any consumers. The FTC may, however, continue to enforce the judgment to garner and pool funds that will eventually be used to reimburse defrauded consumers through a court-approved redress plan. The FTC may also continue to subpoena billing records and other records for use in a consumer redress plan, and may use such records to bolster their submissions on November 18. In light of this ruling, there is truly no occasion to stay the permanent injunction or enforcement of the judgment pending the filing of any post-judgment motions or an appeal by defendants.

## CONCLUSION

For the reasons stated above, defendants' motion is **GRANTED IN PART** and **DENIED IN PART**. Defense counsel shall submit a proposed order authorizing the disbursement of $10,000 in funds from the Court's registry to Attorney Joel Dichter for attorney's fees and expenses **BY NOON ON FRIDAY, OCTOBER 22, 2010**. Further briefing, based upon the schedule set forth herein, is ordered with respect to the FTC's proposed *pro rata* redress plan.

**IT IS SO ORDERED.**

Dated: October 18, 2010.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

---

[4] While the FTC asserts in its brief that defendants' billing records are unreliable, if the FTC intends to disregard defendants' evidence that refunds were issued to particular customers, it must clearly explain *why* the records are inaccurate or cannot otherwise be trusted.

14