# EXHIBIT 6

**Before the**
**Federal Communications Commission**
**Washington, D.C.  20554**

| | | |
|---|---|---|
| In the Matter of | ) | |
| | ) | |
| Empowering Consumers to Prevent and | ) | CG Docket No. 11-116 |
| Detect Billing for Unauthorized Charges | ) | |
| ("Cramming") | ) | |
| | ) | |
| Consumer Information and Disclosure | ) | CG Docket No. 09-158 |
| | ) | |
| Truth-in-Billing and Billing Format | ) | CG Docket No. 98-170 |


### COMMENTS OF VERIZON AND VERIZON WIRELESS

Michael E. Glover
*Of Counsel*

Edward Shakin
Mark J. Montano
VERIZON
1320 North Courthouse Road
9th Floor
Arlington, VA  22201
(703) 351-3058


*Attorneys for Verizon*
*and Verizon Wireless*

June 25, 2012

## TABLE OF CONTENTS

I.  VERIZON ALREADY PROTECTS ITS WIRELESS CUSTOMERS FROM
    UNAUTHORIZED THIRD-PARTY CHARGES. .................................................. 3

    A.  Verizon Employs Numerous Anti-Cramming Protections, Including a Strict
        Opt-In Process. ............................................................................................... 3

    B.  The Commission Should Continue To Recognize the Significant Differences
        Between Wireless and Wireline Third-Party Billing. ...................................... 8

II. VERIZON PROTECTS ITS WIRELINE CUSTOMERS FROM
    UNAUTHORIZED THIRD-PARTY CHARGES FOR MESSAGE
    TELEPHONE AND BUNDLED SERVICES. ......................................................... 12

    A.  Verizon Employs Numerous Anti-Cramming Protections for the Retained
        Third-Party Services. ..................................................................................... 12

    B.  The Commission Should Recognize the Significant Differences Between the
        Third-Party Billing Verizon Is Discontinuing and Retaining. ........................ 15

    CONCLUSION ............................................................................................................. 18

**Before the**
**Federal Communications Commission**
**Washington, D.C.  20554**

| | | |
|---|---|---|
| In the Matter of | ) | |
| | ) | |
| Empowering Consumers to Prevent and | ) | CG Docket No. 11-116 |
| Detect Billing for Unauthorized Charges | ) | |
| ("Cramming") | ) | |
| | ) | |
| Consumer Information and Disclosure | ) | CG Docket No. 09-158 |
| | ) | |
| Truth-in-Billing and Billing Format | ) | CG Docket No. 98-170 |

### COMMENTS OF VERIZON AND VERIZON WIRELESS

Verizon and Verizon Wireless ("Verizon")[1] are committed to protecting their customers from unauthorized charges.  In today's fiercely competitive environment, Verizon has every incentive to avoid losing a customer due to unauthorized third-party charges.  This is not mere talk as Verizon demonstrated earlier this year.  In March, Verizon announced that it will cease providing wireline billing services to third parties that offer miscellaneous or enhanced services, which, in general, are services that are unrelated to the use of Verizon's network.  Although cramming complaints to Verizon for the discontinued services comprise only a small fraction of bills containing third-party charges, even that figure is too high.  Other major carriers, including AT&T and CenturyLink, followed Verizon's lead and announced similar policy changes.

This decision will curtail a significant portion of Verizon's existing third-party billing, and in particular will address the third-party charges that have been at the center of the government's recent cramming inquiries.  To the extent Verizon continues to allow

---

[1] In addition to Verizon Wireless, the Verizon companies participating in this filing are the regulated, wholly owned subsidiaries of Verizon Communications Inc.

third-party billing for some other services that do not raise the same cramming issues, it will do so only subject to safeguards to prevent unauthorized charges. For instance, to the extent Verizon permits third-party charges on its wireless bills, it does so subject to a double opt-in or equivalent procedure that is designed to ensure that the customer's affirmative consent is obtained before a third-party charge appears on his or her bill. And Verizon continues to evaluate possible ways to enhance the existing double opt-in and other procedures to provide still further protection against unauthorized charges reaching a customer's bill. With these protections in place, wireless customers can take advantage of the ease and convenience of using their wireless bills for third-party purchases or donations to charity or political campaigns that they affirmatively authorize.[2]

Likewise, for wireline customers, Verizon will permit third-party billing for services provided by strategic partners that are sold in Verizon-packaged bundles and for message telephone services, which use the Verizon network. These are not the types of services that have generated substantial cramming complaints to Verizon. Nonetheless, to minimize instances of cramming for these services, Verizon will retain the robust safeguards it has in place today, and Verizon will continue to monitor their effectiveness on a regular basis. Moreover, the *Cramming Order* requires Verizon and other wireline

---

[2]    See, e.g., *Political Committees May Accept Contributions Made Via Text Message*, FEC AO 2012-17 (issued June 11, 2012), http://www.fec.gov/pages/fecrecord/2012/july/ao2012-17.shtml;  *see also* Thomas Heath, "U.S. cellphone users donate $22 million to Haiti earthquake relief via text," The Washington Post (Jan. 19, 2010), http://www.washingtonpost.com/wp-dyn/content/article/2010/01/18/AR2010011803792.html.

providers to implement additional protections against cramming that apply to all non-bundled, wireline third-party services.[3]

In light of industry's demonstrated responsiveness to consumer concerns about cramming and its existing anti-cramming safeguards, additional regulation of third-party billing that would apply to the aforementioned services for which Verizon will continue to bill is unnecessary. Providers should have the freedom to develop innovative solutions to prevent unauthorized third-party billing.

**DISCUSSION**

## I.   VERIZON ALREADY PROTECTS ITS WIRELESS CUSTOMERS FROM UNAUTHORIZED THIRD-PARTY CHARGES.

### A.   Verizon Employs Numerous Anti-Cramming Protections, Including a Strict Opt-In Process.

Verizon has protections in place so that its wireless customers can enjoy the ease of using their wireless bills for third-party purchases or donations to charity that they affirmatively authorize. Verizon's wireless customers can take advantage of this convenient process to purchase ringtones, wallpapers, games, apps, and other digital content for their wireless devices and to participate in interactive promotions on television and radio. Customers can receive this content via premium short message services, which are text messages used to deliver digital content to customers' handsets, or by directly purchasing digital goods. At the same time, Verizon is able to protect its wireless customers by requiring third-party providers to obtain specific customer authorizations (i.e., opt-ins) before each purchase.

---

[3]      *See Empowering Consumers to Prevent and Detect Billing for Unauthorized Charges ("Cramming")*; *Consumer Information and Disclosure*; *Truth-in-Billing and Billing Format*, Report and Order and Further Notice of Proposed Rulemaking, CG Docket Nos. 11-116, 09-158 & 98-170 (April 27, 2012) ("*Cramming Order*").

The unique nature of wireless service enables this important protection. Specifically, the wireless handset that receives the purchased content has an essential role in Verizon's required customer authorization process.  For each specific transaction, the customer must complete a double opt-in or equivalent process that involves the handset. As described in more detail below, this two-step process is designed to ensure that the customer making the purchase and thus receiving the content or goods is the same customer that will be receiving the bill.

Verizon explains below its various policies designed to protect its wireless subscribers from unauthorized third-party charges.  Verizon regularly evaluates these policies to ensure their effectiveness.  Many of the protections Verizon utilizes stem from industry-developed best practices, which Verizon had an active role in developing.

Premium Short Message Services.  Verizon offers customers the ability to purchase certain types of content, such as text-based content (e.g., alerts, jokes, weather), downloadable content (e.g., ringtones, wallpaper), and charitable donations (e.g., Haitian earthquake relief) from third-party service providers using premium short message services.  Customers can make one-time purchases or sign up for monthly subscriptions through premium short message services.  The third-party service providers typically utilize messaging aggregators, which enter into agreements with Verizon.

In those agreements, Verizon requires that the aggregators, and the third-party service providers they support, comply with the then-current version of the Mobile Marketing Association's "Consumer Best Practices Guidelines For Cross-Carrier Mobile

Content Services," in addition to certain supplemental, Verizon-specific requirements.[4]
These include, among other things, a double opt-in authorization process.  Best Practice
2.6.1 indicates that "premium rate programs require double opt-in" and explains that
"premium subscribers must positively acknowledge the acceptance of a premium charge
before premium charges are applied to their account."[5]  In practice, customers initiate the
double opt-in process either directly from their devices by sending text messages to four
to six digit short codes, by inputting their mobile telephone numbers at websites, or by
calling certain abbreviated dialing codes.  Customers then receive a text message from
the third-party service provider that details the charges for that premium short message
service and instructions on how to complete an additional opt-in to consent to the
premium charges.  Only then can the messaging aggregators transmit the associated
charges to Verizon for inclusion in the wireless bills of the pertinent customers.

     Other Verizon policies further protect consumers from unauthorized premium
short message service charges.  Specifically, Verizon, working with Aegis Mobile, a
third-party compliance monitoring service provider, reviews and approves each premium
short message service program prior to launch to ensure that the program comports with
the Best Practices Guidelines and additional Verizon-specific requirements, and that the
service provider and aggregator have no history of legal violations relating to consumer

---

[4]    *See* Mobile Marketing Association, "U.S. Consumer Best Practices Version 6.1"
(effective April 1, 2011),
http://mmaglobal.com/Consumer_Best%20Practices_6.1%20Update-
02May2011FINAL_MMA.pdf ("Best Practices Guidelines").

[5]    *Id*. at 31.

protection.  In addition, Aegis Mobile monitors all existing premium short message service programs at least once a month to ensure compliance.[6]

Furthermore, when an issue does arise and customers call Verizon to complain, Verizon attempts to resolve the complaints on the initial call, either by resolving concerns related to the purchase or providing a credit when appropriate.  Verizon closely monitors the adjustments for each premium short message third-party provider and will suspend and terminate providers whose monthly adjustments exceed certain thresholds, regardless of the reason for the adjustments.

In addition, Verizon offers a free mechanism for customers to block charges from premium short message service programs.  The block prohibits new subscriptions to and the continued use of premium short message service programs.  Verizon's website has information about this block (and various other blocks) and a mechanism for customers to activate the block.[7]  Information about the third-party billing and the existence of the free block also appears in the customer agreement that Verizon provides to new wireless customers.

Finally, Verizon limits the amount that third-party service providers can charge for a premium short message service program to $9.99, imposes an aggregate monthly cap for purchases of premium short message service programs, sends a notification e-

---

[6]     Violations may result in termination of the affected program or service provider and/or litigation against the service provider, depending on the severity of the violations. In 2011, Verizon terminated all the premium short message service programs of a group of affiliated third-party service providers – the parent company is Eye Level Holdings, LLC a/k/a Jawa – that were using premium short message services to defraud customers, and then filed a lawsuit against the entire group in federal court in Arizona.  *See, e.g.*, *Cellco Partnership v. Jason Hope*, Order and Preliminary Injunction, Case No. 11-cv-00432 (D. Az. May 11, 2011).

[7]     *See* http://support.verizonwireless.com/information/blocks_comparison.html.

mail to account holders every time a purchase is made using premium short message service by one of the devices on their accounts, requires that premium short message service programs comply with the CTIA content guidelines,[8] and ensures that content ratings are assigned to all premium short message service programs and uses those ratings to integrate all such programs with its parental controls.

Verizon is similarly determined to combat the seemingly increasing occurrence of spam text messages. While Verizon deploys sophisticated filters to block spam text messages and regularly monitors the network for indications of blasts of spam, unfortunately, some messages may get through to customers. To prevent such messages, Verizon offers customers free blocking services to block text messages from specific email addresses, web domains, or phone numbers. In addition, Verizon has initiated legal action against several spammers in recent years.[9]

Digital Goods. Verizon also allows customers in limited situations to charge digital goods, such as song downloads and mobile applications, to their wireless phone bills. As an initial matter, Verizon limits the charges for third-party goods that can be placed on customers' bills to specific, pre-approved vendors and goods and services. These vendors undergo a thorough due diligence review, during which Verizon investigates whether the vendor has any history of legal violations relating to consumer protection before permitting the vendor to place charges on Verizon's bills.

---

[8]     *See* CTIA, "Consumer Code for Wireless Service," http://files.ctia.org/pdf/CTIA_Consumer_Code_for_Wireless_Service_Rev__Oct_2011.pdf ("CTIA Consumer Code for Wireless Service").

[9]     *See, e.g.*, "Verizon Wireless Continues Efforts To Stop Spammers; Files Lawsuit Against Money Warehouse, Inc.," http://news.verizonwireless.com/news/2009/05/pr2009-05-05a.html.

Moreover, as with premium short message services, Verizon requires a two-factor authentication equivalent to a double opt-in.  Unless the device sends the phone number to the web application, customers will be prompted to input their phone number and zip code into the relevant website.  Then, the website or an associated application attempts to confirm that the phone number entered is the phone number assigned to the device used by the customer to purchase the digital goods.  If the website or application authenticates the user, the customer is then sent a passcode in a text message to the number entered. The customer must then enter this passcode into the website to confirm the purchase.  If the user cannot be authenticated, the customer cannot complete the purchase and the charge will not appear on his or her Verizon bill.

In addition to this authentication regime, Verizon has adopted other protections to ensure customers are not charged for unauthorized digital goods purchases.  Verizon's complaint resolution process, free blocking option, and monthly cap for purchases are nearly identical to those described above for premium short message services.  Verizon also will terminate billing on behalf of digital good providers whose monthly adjustments exceed a certain level.  Moreover, Verizon sends a notice to account holders the first time a digital goods purchase will be placed on their account and provides a description of each purchased product/service on the customer's wireless bill.

### B. The Commission Should Continue To Recognize the Significant Differences Between Wireless and Wireline Third-Party Billing.

Consistent with its approach in the past, the Commission should recognize that the significant differences between wireless and wireline third-party billing call for different regulatory treatment.  These differences, along with the numerous protections

described above, make clear that no regulation is necessary to protect customers of wireless carriers from unauthorized third-party charges.[10]

*First*, as discussed earlier, the types of charges that are currently placed on wireless customers' bills are fundamentally different than those placed on wireline customers' bills because the charges on wireless bills are related to the customer's handset. The vast majority of charges on Verizon's wireless bills currently are for premium short message services that are delivered to the handset. However, the expanding customer base with smartphones has increased the utility to customers of placing charges for mobile content, such as music and video downloads, mobile applications, and games, on their wireless bills. These purchases are often made on the customer's handset, and even if not, wireless carriers generally send a message to the customer's handset to confirm that the purchase is authorized prior to placing the charge on a bill. There is no analogue to the customer's possession of the handset for the third-party billing that Verizon is stopping.

*Second*, the wireless industry has already established robust standards that are designed to protect consumers from unauthorized charges. For example, the Mobile

---

[10]     As a threshold matter, the Commission can only exercise authority delegated to it by statute. It has long been established that carrier billing or collection for third parties falls outside Title II of the Communications Act. *See, e.g.*, *Detariffing of Billing and Collection Services*, Report and Order, 102 F.C.C.2d 1150, ¶ 31 (1986) ("*Detariffing Order*"); *see also Policies and Rules Concerning Local Exchange Carrier Validation and Billing Information for Joint Use Calling Cards*, Order on Reconsideration, 12 FCC Rcd 1632, ¶ 32 (1997). In the *Cramming Order*, the Commission narrowly reads this precedent, concluding that it would not apply if the third-party charges are on the same bill as carrier charges. *See Cramming Order*, ¶¶ 123-25. That unnaturally restrictive reading is inconsistent with the *Detariffing Order*'s likening carriers to credit card companies – i.e., entities that aggregate charges from various providers to place on a single bill. *See Detariffing Order*, ¶ 31. And any claim of ancillary authority under Title I by the Commission would fail, in part, because there is no substantive statutory provision in Title II to which the proposed action would be ancillary.

Marketing Association has published a Code of Conduct that provides specific guidelines to companies within the mobile ecosystem, including advertisers, aggregators, application providers, wireless providers, content providers, and publishers, regarding how to build their mobile marketing programs.[11]  The Mobile Marketing Association, in its "Consumer Best Practices" described above, provides detailed requirements for providing premium short message services over wireless providers' networks, including a double opt-in requirement.[12]  Along with Verizon, other wireless providers, including AT&T, Sprint, and T-Mobile, have stated that they adhere to these practices.[13]  In addition, CTIA and the wireless industry have developed a set of content guidelines for content delivered over mobile devices.[14]

These industry standards are working.  As the Commission notes, the significant majority of cramming complaints are related to wireline services, not wireless services.[15] In contrast to the Commission's suspicion that wireless cramming may be a growing problem,[16] Verizon has not seen any material increases in billing adjustments (which could be from cramming or various other reasons) for premium short message services or digital goods in recent years.  Even as the amount billed for digital goods has doubled

---

[11]     Mobile Marketing Association, "Global Code of Conduct" (July 15, 2008), http://mmaglobal.com/codeofconduct.pdf.

[12]     *See* Best Practices Guidelines at 6.

[13]     *See* AT&T Comments at 9 n.16 (Oct. 24, 2011); Sprint Comments at 6 (Oct. 24, 2011); T-Mobile Comments at 4 (Oct. 24, 2011).

[14]     *See* CTIA Consumer Code for Wireless Service, at 8.

[15]     *See Cramming Order* ¶ 47; *see also Empowering Consumers to Prevent and Detect Billing for Unauthorized Charges ("Cramming")*; *Consumer Information and Disclosure*; *Truth-in-Billing and Billing Format*, Notice of Proposed Rulemaking, 26 FCC Rcd 10021, ¶ 53 (2011) ("the majority of the cramming complaints filed with the Commission and the FTC relate to wireline, rather than wireless, service—82 percent of Commission cramming complaints from 2008 to 2010, and 90 percent of FTC cramming complaints in 2010").

[16]     *See Cramming Order* ¶ 47.

over the past year, the percentage of the charges that have been adjusted has remained relatively steady.

Verizon regularly evaluates billing adjustment trends and uses that data (along with other information) to adjust its practices, where appropriate, to provide even greater protection to customers.   If evidence arises that wireless carriers' current practices are ineffective at protecting consumers from cramming, the wireless industry has a proven track record of coming together to address the problem *without regulation*.  For example, CTIA and the wireless industry recently updated the Consumer Code for Wireless Service to include usage alerts and have taken steps to minimize incidents of stolen handsets working cooperatively with Chairman Genachowski.[17]  Due to the wireless industry's adherence to the Mobile Marketing Association's best practices, which include a double opt-in requirement, it would be counterproductive and impose needless costs of compliance on carriers for the Commission to adopt a different opt-in requirement, such as the one in Verizon's wireline class action settlement agreement.  While Verizon offers a similar two-factor authentication requirement for digital goods purchases, to the extent other wireless providers do not, Verizon would be willing to work with the industry to craft an appropriate best practice.

*Third*, the application of the proposed rules to wireless services could inhibit innovation.  In light of the evolving wireless ecosystem, particularly the growing prevalence of mobile content, consumers are increasingly demanding the ability to

---

[17]    *See* Press Release, "CTIA-The Wireless Association®, Federal Communications Commission and Consumers Union Announce Free Alerts to Help Consumers Avoid Unexpected Overage Charges" (Oct. 17, 2011), http://www.ctia.org/media/press/; *see also*, CTIA Press Release, "U.S. Wireless Industry Announces Steps to Help Deter Smartphone Thefts and Protect Consumer Data" (April 10, 2012), *supra*.

11

purchase goods and services over their handset or using their handset and to charge these goods and services to their wireless bills.  Wireless providers are currently meeting these demands in ways that protect consumers from unauthorized charges.  These services, however, are still new in the wireless space.  Premature regulation could not only inhibit their development, but also the development of innovative ways to protect consumers from unauthorized charges.

## II.     VERIZON PROTECTS ITS WIRELINE CUSTOMERS FROM UNAUTHORIZED THIRD-PARTY CHARGES FOR MESSAGE TELEPHONE AND BUNDLED SERVICES.

### A.     Verizon Employs Numerous Anti-Cramming Protections for the Retained Third-Party Services.

To protect its customers, Verizon has decided to eliminate third-party billing for miscellaneous or enhanced services – i.e., those services that have generated the bulk of the cramming complaints.  Verizon will continue to allow the remaining third-party services to appear on its wireline bills because it has strong protections in place to prevent cramming.

On March 19, 2012, Verizon notified its billing aggregators and third-parties with whom it had direct contracts that Verizon will no longer allow third-party charges for miscellaneous or enhanced services to appear on its bills after a certain date.  Miscellaneous or enhanced services are services that are unrelated to the use of a provider's network, such as web hosting, voicemail, and email, and these services have been the focus of the recent government inquiries and actions to curtail cramming.  Rather than continuing its efforts to ferret out illegitimate providers of these services, Verizon decided to take the bold step of ceasing this third-party billing altogether.

12

Verizon will continue to allow wireline customers to enjoy the convenience of a single bill for third-party message telephone services, which use the Verizon network and do not raise the same cramming issues. Verizon will also continue to provide customers with billing for third-party services that are marketed in a bundle with other Verizon-provided services. Verizon will employ the anti-cramming measures it has in place today for the retained third-party services and, as it does today, will regularly assess the effectiveness of those measures.

For example, Verizon screens third-party service providers via an application process. Verizon will research the identified principals to determine if the provider is affiliated with any entity with which Verizon has previously experienced cramming-related issues, which will nearly always result in the application's rejection. In addition, third-party service providers must submit their proposed marketing materials to Verizon for approval. Verizon reviews these materials to help ensure that they are not misleading and that they clearly disclose the price of the products and/or services offered. Verizon will demand changes to ensure the materials are accurate and refuse to bill if the changes are not made.

Verizon has also implemented processes to monitor the number of verified cramming complaints by provider. If those complaints exceed either a certain absolute number or a specific low percentage of total bills in a month, Verizon will notify the billing aggregator through which the third-party submits bills or the third-party itself (if it has a direct contract with Verizon) and require the provider to submit an "Action Plan" to reduce the number of complaints within ten days. Verizon will continue to monitor

13

verified cramming complaints and will terminate billings on behalf of the third-party service provider if its complaint levels do not fall below Verizon's cramming thresholds.

Moreover, Verizon seeks to quickly resolve individual customer complaints regarding third-party message telephone services. For example, Verizon will attempt to resolve the issue on the customer's first call to Verizon. In many cases, a Verizon representative can view the third-party's network records while on the phone with the customer. Only if Verizon has no ability to conduct this inquiry will the representative refer the customer to the third-party provider for resolution. If the customer refuses to contact the third-party provider or if the customer's complaint to the third-party is not resolved, Verizon will recourse the charges back to the third-party service provider.

In addition, as with its wireless customers, Verizon offers its wireline customers the ability to block certain charges from their bills. For example, Verizon has blocks for long distance, collect calls, and third-party calls. These blocks apply to both third-party charges and those from Verizon for the particular services.

Notably, these anti-cramming measures are not unique to Verizon. In comments filed earlier in this proceeding, other wireline providers described their efforts to combat cramming. For instance, AT&T explained its third-party application and review process, its cramming complaint thresholds, and its complaint resolution process.[18] CenturyLink detailed similar policies to protect its customers.[19] There is nothing to suggest that these providers will eliminate or reduce their existing protections when they stop billing for certain third-party services.

---

[18]   *See* AT&T Comments at 9 (Oct. 24, 2011).
[19]   *See* CenturyLink Comments at 12-14 (Oct. 24, 2011).

Finally, the industry's existing anti-cramming measures will be augmented in the coming months by the *Cramming Order*'s requirements.  The *Cramming Order* applies to *all* wireline third-party charges, except those that are packaged in a bundle with the carrier's services.  That is, it impacts the types of third-party services for which Verizon and other wireline providers are ceasing to bill *and* those that will be continued.  For the continuing third-party services, wireline providers will separate and subtotal the charges on the bill, and they will inform the customer about the various blocking options available at the point of sale, on each bill, and on its website.  These are substantial steps, and it would be premature for the Commission to conclude that more protections are necessary.

> **B.      The Commission Should Recognize the Significant Differences Between the Third-Party Billing Verizon Is Discontinuing and Retaining.**

The third-party wireline services for which Verizon will continue to bill – i.e., message telephone and bundled services – do not raise the same types of customer authorization issues as the miscellaneous and enhanced services that Verizon is terminating.  These retained services are typically not the subject of cramming complaints and were not subject to Verizon's class action settlement agreement referred to in the *Cramming Order*.[20]

Message telephone services provided by third-parties include 0+ and 0- calls; 10xxx calls; 1+ calls; collect calls; and third-party billed calls (i.e., calls billed to a number that is not the calling or called number, such as calls placed from a hospital).  Because a customer places these calls over Verizon's and/or another carrier's network(s),

---

[20]      *Cramming Order* ¶ 138.

the carrier switch or other network records will reflect the start and end times of such calls, the duration, the calling and called number, and other identifying information.  In addition, Verizon will allow third-party billing for certain charges associated with such calls, such as charges for calling plans, Universal Service, and PIC changes as well as administrative cost recovery fees.

The customer's authorization of the calls and charges is more readily ascertained for these third-party services.  Switch or other network records generated by these calls provide evidence that the customer has chosen or "opted-in" to billing from the third-parties.  Requiring customers to provide additional consent for these third-party services could be harmful to consumers as many of these services are for calls of an immediate or emergency basis when contacting a carrier may not be possible.[21]  This key differentiator has been acknowledged in other contexts.  For instance, those commenters that propose a ban of or significantly limiting third-party billing generally recognize the need for exceptions for these types of services.[22]

In addition, Verizon's continued billing for these third-party charges is consistent with customer expectations.  Due, in part, to the Commission's historical requirements that carriers provide billing services for these charges, wireline consumers expect charges for *all* calls to or from their phones – whether local, non-local, or specially billed calls – and fees associated with such calls to appear on one telephone bill.

Likewise, Verizon's placing charges from third parties with which Verizon jointly markets bundles of services on its bills does not raise significant cramming concerns.

---

[21]     The Commission acknowledges this distinction in the *Cramming Order*; *see id*. ¶ 139.

[22]     *See*, *e.g.*, 17 State Attorneys General Comments at 23 (Oct. 24, 2011).

Bundled services are sold for a single price, and customers of the bundle expect to see the total charge for the bundle in a single place on their Verizon bills.  In the *Cramming Order*, the Commission recognized that separating charges for bundled offerings on the bill "would be extremely confusing for customers."[23]  The same holds true for any other anti-cramming measures that the Commission may be considering that would apply to some aspects of the bundle, but not others.  Any opt-in requirement the Commission may be considering makes little sense when the customer already opts-in for the billing of the third-party provided service when he places the order for the bundle directly with a Verizon representative.

By contrast, the third-party services for which Verizon is ceasing to bill – i.e., miscellaneous or enhanced services – are services that are unrelated to the use of Verizon's network and are not bundled with other Verizon-provided services.  A customer's use of these services creates no records in Verizon's network.  Nor does Verizon have a record in its network that the customer on whose bill the charge appears authorized the purchase.[24]  As a result, in Verizon's experience, charges for these services may be more prone to cramming, and Verizon's class action settlement agreement is intended to address this issue.  Moreover, there may be wireline consumers who would not expect charges for these services – some of which may be wholly unrelated to voice service – to appear on their phone bills.[25]

---

[23]     *Cramming Order* ¶ 73.

[24]     That said, Verizon contractually obligates third-party providers to obtain (and retain for future inquiry) a specific form of customer authorization before the third-party can submit charges for Verizon's bills.

[25]     This is not true for wireless customers who typically expect purchases unrelated to telecommunications services, but related to their handsets, such as ringtones or apps, to appear on their phone bills.

**CONCLUSION**

Verizon's and the industry's recent decisions to stop billing for the third-party services that were most prone to cramming and the significant anti-cramming safeguards in place today will protect consumers from unauthorized third-party wireless, message telephone, and bundled charges without the need for regulation.

Respectfully submitted,

*Mark J. Montano*

Michael E. Glover                Edward Shakin
*Of Counsel*                     Mark J. Montano
                                 VERIZON
                                 1320 North Courthouse Road
                                 9th Floor
                                 Arlington, VA  22201
                                 (703) 351-3058

                                 *Attorneys for Verizon*
                                 *and Verizon Wireless*

June 25, 2012